THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:03 CV 469-BR(3)



JESSICA R. WILSON, a Minor, )
by and through her parent and )
next friend, DOUGLAS McPHAIL, )
)
    Plaintiff, )
)
v. )
)
DR. TERRY BROWN, PRINCIPAL; )
LUTHER "NICK" JERALDS MIDDLE )
SCHOOL, in his individual )
capacity, JOHN DASKAL, )
HEARINGS APPEALS OFFICER, in )
his individual capacity, the )
CUMBERLAND COUNTY BOARD OF )
EDUCATION in its official )
capacity, KRYSTAL KIRKLAND, )
in her individual capacity, )
and LAURA GOODSON, in her )
individual capacity, )
)
    Defendants. )

**RESPONSE OF DEFENDANTS TERRY
BROWN, JOHN DASKAL, AND THE
CUMBERLAND COUNTY BOARD OF
EDUCATION TO PLAINTIFF'S
MOTION TO DISQUALIFY ATTORNEY**

Local Civil Rule 7.1, EDNC

    NOW COME defendants Terry Brown, John Daskal, and the

Cumberland County Board of Education, and hereby respond to

plaintiff's Motion to Disqualify Attorney for Conflict of

Interests, pursuant to Local Civil Rule 7.1, EDNC. The

undersigned counsel for these defendants submits to the Court

that no conflict exists between these defendants and the

undersigned counsel should be permitted to continue his

representation of them. In support of this Response, the

undersigned counsel incorporates by reference the previously-

YMW: 199332.1

filed affidavits of Terry Brown and John Daskal, the Affidavit of

Ryan M. Shuirman, and Memorandum of Law in Response to

Plaintiff's Motion to Disqualify Attorney for Conflict of

Interests.

This, the 15th day of March, 2004.

YATES, McLAMB & WEYHER, LLP

By: _____
RYAN M. SHUIRMAN
Attorneys for defendants
Brown, Daskal, and
Cumberland County Board of
Education
N.C. State Bar No.: 26746
P.O. Box 2889
Raleigh, NC 27602
(919) 835-0900

YMW: 199332.1

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:03 CV 469-BR(3)

| | |
|---|---|
| JESSICA R. WILSON, a Minor, ) by and through her parent and ) next friend, DOUGLAS McPHAIL, ) )     Plaintiff, ) ) v. ) ) DR. TERRY BROWN, PRINCIPAL; ) LUTHER "NICK" JERALDS MIDDLE ) SCHOOL, in his individual ) capacity, JOHN DASKAL, ) HEARINGS APPEALS OFFICER, in ) his individual capacity, the ) CUMBERLAND COUNTY BOARD OF ) EDUCATION in its official ) capacity, KRYSTAL KIRKLAND, ) in her individual capacity, ) and LAURA GOODSON, in her ) individual capacity, ) )     Defendants. ) | **AFFIDAVIT OF RYAN M. SHUIRMAN** |

I, Ryan M. Shuirman, being duly sworn, depose and say the following:

1.    That I am over 18 years of age, have personal knowledge of the matters herein, and am competent to testify to the matters herein.

2.    That I am counsel of record for defendants Brown, Daskal, and the Cumberland County Board of Education in the present action.

3.    That I am currently a member in good standing of the

YMW: 199331.1

North Carolina State Bar.

    4.    That I have not represented Douglas McPhail or Jessica Wilson in any action at any time.

    5.    That I have not served as plaintiff's counsel in any action against defendants Brown, Daskal, and the Cumberland County Board of Education, and am not doing so in this action.

    6.    That I believe I will be able to provide competent and diligent representation to each of these defendants.


    This, the 15th day of March, 2004.

                        RYAN M. SHUIRMAN

NORTH CAROLINA
WAKE COUNTY

I, *Hazel C Pruette*, a Notary Public for said County and
State, do hereby certify that Ryan M. Shuirman personally
appeared before me this day and acknowledged the due execution of
the foregoing instrument.

Witness my hand and  official seal, this  the 15th day of
*March*    , 2004.

*Hazel C Pruette*
NOTARY PUBLIC

My Commission Expires:    10/7/04

YMW: 199331.1

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:03 CV 469-BR(3)

| | |
|---|---|
| JESSICA R. WILSON, a Minor, )<br>by and through her parent and )<br>next friend, DOUGLAS McPHAIL, )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>DR. TERRY BROWN, PRINCIPAL; )<br>LUTHER "NICK" JERALDS MIDDLE )<br>SCHOOL, in his individual )<br>capacity, JOHN DASKAL, )<br>HEARINGS APPEALS OFFICER, in )<br>his individual capacity, the )<br>CUMBERLAND COUNTY BOARD OF )<br>EDUCATION in its official )<br>capacity, KRYSTAL KIRKLAND, )<br>in her individual capacity, )<br>and LAURA GOODSON, in her )<br>individual capacity, )<br>)<br>    Defendants. ) | **MEMORANDUM IN OPPOSITION TO**<br>**PLAINTIFF'S MOTION FOR**<br>**DISQUALIFICATION OF**<br>**DEFENDANTS' ATTORNEY**<br><br>Local Civil Rule 7.2, EDNC |

### STATEMENT OF FACTS

Jessica Wilson, a minor, was a seventh grade student at Luther
"Nick" Jeralds Middle School on December 6, 2002. (Brown Aff'd.,
¶ 3; Daskal Aff'd., ¶ 3). During that school day, Jessica Wilson
took out of her bag an object with a wooden handle and a thin,
sharp, metal end. (Brown Aff'd., ¶ 9).

The following Monday, December 9, 2002, defendant Terry Brown,
the principal of the school, began his investigation into the
incident. (Brown Aff'd., ¶ 10). Defendant Brown found that

YMW: 198858.1

Jessica Wilson had brought the object to school and showed it to other students, that the object could reasonably be considered a weapon, and that Jessica Wilson had violated Cumberland County Schools Student Code of Conduct provisions regarding the possession of weapons at school. (Brown Aff'd., ¶ 5, 6, 9). Defendant Brown subsequently temporarily suspended Jessica Wilson pending the outcome of a hearing with Jessica Wilson and her parents. (Brown Aff'd., ¶ 10). Following that hearing, defendant Brown then notified Mr. McPhail of his decision to recommend to the Superintendent that Jessica Wilson be suspended from Luther "Nick" Jeralds Middle School for the remainder of the 2002-2003 school year, with the option of attending Ramsey Street Alternative School. (Brown Aff'd., ¶ 21). The Superintendent approved defendant Brown's recommendation, and Jessica Wilson and her mother were given notice of this approval. (Brown Aff'd., ¶ 23). Mr. McPhail was further notified of Jessica Wilson's right to appeal this decision to the Administrative Hearings Officer of the Cumberland County Board of Education, John Daskal. (Brown Aff'd., ¶ 24).

Mr. McPhail did appeal the approval of the suspension by the Superintendent, and a hearing was had before defendant Daskal. (Brown Aff'd., ¶ 25; Daskal Aff'd., ¶ 5). Defendant Daskal found that defendant Brown had followed all accepted procedures and concurred with defendant Brown's recommendation. (Brown Aff'd., ¶

25; Daskal Aff'd., ¶ 8). The Superintendent then upheld the recommendation. (Brown Aff'd., ¶ 27; Daskal Aff'd., ¶ 9).

Mr. McPhail was notified of the Superintendent's decision and the right for further appeal to the Board of Education. (Brown Aff'd., ¶ 28; Daskal Aff'd., ¶ 10). This last appeal procedure is a de novo review in which Mr. McPhail, on behalf of Jessica Wilson, would have been permitted to present further evidence of defenses or excuses for the conduct giving rise to the suspension. (Brown Aff'd., ¶ 29; Daskal Aff'd., ¶ 11). Mr. McPhail did not pursue this final appeal of the Superintendent's decision, and Jessica Wilson was subsequently enrolled in Ramsey Street Alternative School. (Brown Aff'd., ¶ 30, 31; Daskal Aff'd., ¶ 14).

## STATEMENT OF THE CASE

Plaintiff's complaint was filed on June 26, 2003. Defendants Brown, Daskal, and the Cumberland County Board of Education (hereinafter "these defendants") served their answer on July 24, 2003. Plaintiff served her Motion for Summary Judgment on September 11, 2003. These defendants served their response to plaintiff's Motion for Summary Judgment. This Court denied plaintiff's Motion for Summary Judgment on January 6, 2004. Plaintiff then served defendants' counsel with her Motion for Disqualification of Defendants' Attorney on February 23, 2004. This case is now before this Court on plaintiff's Motion for Disqualification of Defendants' Attorney.

## SUMMARY OF ARGUMENT

No conflict exists for the undersigned counsel to represent defendants Brown, Daskal, and the Cumberland County Board of Education in this action. Plaintiff alleges various causes of action against these defendants collectively and maintains that their liability to her arises generally out of their failure to follow established procedures for suspending students, or that they followed constitutionally flawed procedures in suspending plaintiff. These three defendants have responded to plaintiff's allegations by denying that they are liable to plaintiff because they followed established procedures in deciding to suspend plaintiff and that those procedures in and of themselves do not violate plaintiff's constitutional rights. As such, there is no discrepancy between the positions of these defendants in response to the allegations contained in plaintiff's complaint, and no conflict exists for these three defendants to be represented by the same counsel.

## ARGUMENT

A motion to disqualify "is a serious matter which cannot be based on imaginary scenarios of conflict, and the moving party has a high standard of proof to meet in order to prove that counsel should be disqualified." George v. McClure, 266 F.Supp.2d 413, 419, (M.D.N.C. 2001), appeal dismissed 26 Fed.Appx. 297 (4th Cir. 2002), cert. denied 536 U.S. 941, 122 S.Ct. 2623, 153 L.Ed.2d 805

(2002). The analysis of whether disqualification is appropriate should avoid an "overly mechanical application of disciplinary canons at the expense of litigants' rights to choose their counsel." Id., citing Shaffer v. Farm Fresh, Inc., 966 F.2d 142, 146 (4th Cir. 1992), cert. denied 506 U.S. 1021, 113 S.Ct. 657, 121 L.Ed.2d 583. A Court should also be mindful of the "possibility of misuse of disqualification motions for strategic reasons." Shaffer, 966 F.2d at 146.

Rule 1.7 of the North Carolina Rules of Professional Conduct provides that even if a concurrent conflict exists in representing one or more clients in the same litigation, the lawyer may represent the clients if "the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client." Comment 23 to Rule 1.7 states that "common representation of persons having similar interests in civil litigation is proper."

In the present action, no conflict exists between defendants Brown, Daskal, and the Cumberland County Board of Education. They all have similar interests in this litigation in that they followed established procedures for the suspension of plaintiff and they all contend in this suit that the procedures which were followed do not violate plaintiff's constitutional and statutory rights. Because their interests are similar, there is no conflict for undersigned counsel of record to represent them in this action. Common

representation is thus proper.  Moreover, plaintiff cannot meet the "high standard of proof" required on this motion to disqualify undersigned counsel from representing these defendants.

Plaintiff alleges that the primary issue giving rise to a conflict between these defendants is the pursuit of punitive damages against these defendants and plaintiff's acknowledgement of defendant Cumberland County Board of Education's immunity from punitive damages under 42 U.S.C. § 1983.  Plaintiff asserts that an attorney must avoid the fact of or even the appearance of a conflict of interest in representing multiple clients, and thus, that the undersigned counsel has a conflict of interest in representing these individual defendants *and* the Board of Education.  Plaintiff cites as authority for the position that this alleged conflict of interest disqualifies undersigned counsel from representing these defendants the case of <u>Board of Education of New York City v. Nyquist</u>, 590 F.2d 1241 (2d Cir. 1979).  For the reasons stated below, these defendants respectfully submit to the Court that no conflict of interest exists and that plaintiff's Motion to Disqualify the undersigned counsel should be denied.

In <u>Nyquist</u>, groups of female and male teachers were defendants in a declaratory judgment action brought by the Board of Education arising out of the maintenance of separate seniority lists for male and female teachers.  <u>Id.</u> at 1243.  The male defendants were represented by the general counsel for the New York State United

Teachers (NYSUT), an organization which received funds form the American Federation of Teachers – a national organization which represented the male and female defendants in collective bargaining. Id. at 1244. The female teachers moved the trial court to disqualify the attorney from representing the male teachers because the attorney's affiliation with the NYSUT meant that the female teachers were effectively paying the male teachers' legal expenses. Id. That motion was allowed at the trial level and was then reviewed on appeal to the Second Circuit Court of Appeals. Id. at 1243.

The appellate court first acknowledged that:

> with rare exceptions disqualification has been ordered only in essentially two kinds of cases: (1) where an attorney's conflict of interests in violation of 5 and 9 of the Code of Professional Responsibility undermines the court's confidence in the vigor of the attorney's representation of his client, [citations omitted] or more commonly (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation, for example, in violation of Canons 4 and 9, thus giving the his present client an unfair advantage.

Id. at 1246. Canons 4, 5, and 9 provided that "a lawyer should preserve the confidences and secrets of a client," "a lawyer should exercise independent judgment on behalf of a client," and "a lawyer should avoid even the appearance of professional impropriety," respectively. Id. Moreover, the appellate court noted that its reluctance to disqualify attorneys probably derived from "the fact

that disqualification has an immediate adverse effect on the client by separating him from counsel of his choice, and that disqualification motions are often interposed for tactical reasons." Id.

Attempting to avoid the prospect of an attorney's representation of a client "tainting" a trial, the appellate court found that the attorney was vigorously representing the male teachers and that the male teachers had gained no unfair advantage through any access to confidential information. Id. at 1247. Further noting that "courts should be quite hesitant to disqualify an attorney" and that there is "usually no need to deal with all other kinds of ethical violations in the very litigation in which they surface," the appellate court reversed the order of the trial court disqualifying the attorney for the male teachers. Id. at 1246. Although there was at least some possibility of "the appearance of impropriety" in allowing the attorney to continue to represent the male teachers, the appellate court found the disqualification of the attorney below to be "inappropriate." Id. at 1247.

In the present case, defendants Brown, Daskal, and the Cumberland County Board of Education do not have the conflict shared by the defendants in the Nyquist case. Whereas the defendant male and female teachers in Nyquist were actually the opposing parties in that declaratory judgment action, the interests

of defendants Brown, Daskal, and the Cumberland County Board of Education are aligned in defending against plaintiff's claims. If the <u>Nyquist</u> court found that no conflict existed to cause the disqualification of the attorney for the male teachers, then this Court should deny plaintiff's motion here since no conflict exists between the defendants.

Plaintiff also identifies, in plaintiff's Brief in Support of Plaintiff's Motion to Disqualify Attorney, a quotation from "North Carolina State Bar, at CPR 317." Undersigned counsel assumes plaintiff is citing an annotation to Rule 1.7 of the Rules of Professional Conduct which cross-references an ethics opinion adopted under the superseded 1973 Code of Professional Responsibility. This quotation is indicative of the impropriety of plaintiff's Motion to Disqualify. Plaintiff writes:

> an attorney appointed to represent a state official or agency may not represent other clients in a suit against the same official or agency, another official or agency under the jurisdiction of that same official or agency or another official or agency with authority over the official or agency. Nor should an attorney represent one official or agency while representing other clients against another official or agency if both the officials or agencies are under the same jurisdiction of the same official or agency.

Even without knowing the context or reviewing the complete ethics opinion from which this annotation was apparently derived, it is clear this authority relied upon by plaintiff has no bearing on undersigned counsel's representation of these defendants in this

case. Plaintiff's argument seems to ignore the word "against" in the above quotation, as the quotation precludes representing officials and agencies and then later representing another client against those same officials or agencies (or related officials or agencies) in a separate suit. Undersigned counsel is not representing these defendants in this case in any situation prohibited by this above quotation. Plaintiff's reliance on this quotation does not support the argument that undersigned counsel should be disqualified from representing these defendants, and plaintiff's motion, therefore, should be denied.

Plaintiff also cites State v. Yelton, 87 N.C. App. 554, 361 S.E.2d 753 (1987) in support of the Motion to Disqualify Attorney. In that case, an attorney who was retained to defend two criminal defendants was ordered by the trial court to represent only one defendant on the State's motion requesting a determination of whether the attorney's representation of both defendants was proper. Id. at 554, 361 S.E.2d at 754. The trial court allowed the State's motion, ordered the attorney to represent only one defendant, and appeal was taken to the North Carolina Court of Appeals. Id.

The Yelton decision involved an inquiry into whether a criminal defendant's constitutional right to effective counsel was implicated by an attorney's representation of that defendant and another in a single criminal case. Nevertheless, the North

Carolina Court of Appeals cited several federal cases in noting that "in some instances there might be advantages in joint representation," and "prejudice to a defendant could not be presumed from the mere fact of joint representation." Id. at 560-61, 361 S.E.2d at 758. The North Carolina Court of Appeals, in vacating the order from the trial court and thereby allowing the defense attorney to represent both defendants, ruled that:

> only where there is an actual conflict of interest which denies the defendants the effective assistance of counsel does a problem arise. A *potential* conflict of interest, as distinguished from an *actual* conflict of interest, is not sufficient to warrant the State's interference . . . [and] a potential conflict of interest which is not shown to substantially prejudice defendant's interests is not sufficient to justify interference with defendant's right to representation by the retained counsel of his choice.

Id. at 561-62, 361 S.E.2d at 753. Although these defendants do not concede that a conflict exists between them, at most only a potential conflict exists which, according to Yelton, would be insufficient to justify disqualifying undersigned counsel.

Plaintiff's reliance on Fisher Studio, Inc. v. Loew's Inc., 232 F.2d 199 (2d Cir. 1956), cert. denied, 352 U.S. 836, 77 S.Ct. 56, 1 L.Ed.2d 55 (1956), regardless of its not being binding authority on this Court, is similarly unfounded. At issue in that case was an attorney's disqualification for previous representation of a defendant in antitrust cases. Id. at 200. The present case does not present any issues of conflict by previous representation,

and thus, the Fisher Studio case is not determinative of any issue in this case.

By and large, plaintiff has relied upon case law which, if pertaining to the disqualification issue at all, involves issues of conflict for the attorney which are inapplicable to the situation of these defendants in the present action. For instance, plaintiff cites criminal cases or those with litigants who were previously represented by the attorney at the heart of the disqualification motion. The present case is obviously a civil action with no criminal component, and undersigned counsel has not represented plaintiff or any of the defendants in previous actions.

Plaintiff here has also cited, in support of the Motion to Disqualify, the case of Spence v. Staras, et al., 507 F.2d 554 (7ᵗʰ Cir. 1974) as authority for the proposition that separate counsel must be retained for agents of a state in actions under 42 U.S.C.A. § 1983 which allege both compensatory and punitive damages. In that case, the defendants were "eight agents and employees of the Peoria State Hospital, an institution owned and operated by the State of Illinois." Id. at 556. Despite plaintiff's contentions here, the defendants in Spence were represented by one assistant attorney general. Id. Because the Spence court did not find that the same attorney could not represent the defendants, plaintiff's motion should be denied.

The Nyquist decision discussed above is the only other case

cited by plaintiff which involved a situation remotely resembling that of these defendants, and because the <u>Nyquist</u> court similarly found that the same attorney could represent both groups of defendants, plaintiff's motion to disqualify undersigned counsel from representing these defendants should be denied.

Lastly, plaintiff prays the Court to sanction undersigned counsel for "willfully attempting to violate the Professional Rules, and for showing contempt for the Court and Plaintiff with the multiple representation of all Defendants' [sic] simultaneously, in violation of the Professional Rules." With all due respect to this pro se plaintiff who is not a member of the North Carolina State Bar, undersigned counsel takes issue with any prayer for sanctions and any allegation of unprofessional conduct before the Court. No conflict exists between these defendants which gives rise to the disqualification of the undersigned counsel, and undersigned counsel has not taken any action in this case which has violated the Rules of Professional Conduct, nor attempted to violate the Rules with any willful act as plaintiff suggests.

<div align="center">

**CONCLUSION**

</div>

For the reasons stated in the foregoing memorandum, these defendants respectfully pray that the Court deny plaintiff's Motion to Disqualify Attorney.

YMW: 198858.1                    13

This, the 15th day of March, 2004.

YATES, McLAMB & WEYHER, LLP

By: _____
RYAN M. SHUIRMAN
N.C. State Bar No.: 26746
Attorneys for defendants Brown,
Daskal, and the Cumberland
County Board of Education
P.O. Box 2889
Raleigh, NC 27602
Telephone:(919) 835-0900
Fax:      (919) 835-0910

**TABLE OF AUTHORITIES**

## Cases

<u>Board of Education of the City of New York v.
Nyquist</u>, 590 F.2d 1241 (2d Cir. 1979) .................. 5-8, 12

<u>Fisher Studio, Inc. v. Loew's, Inc.</u>, 232
 F.2d 199 (2d Cir. 1956) ............................... 10-11

<u>George v. McClure</u>, 266 F.Supp.2d 413
(M.D.N.C. 2001) .......................................... 4-5

<u>Shaffer v. Farm Fresh, Inc.</u>, 966 F.2d 142,
146 (4th Cir. 1992) ........................................ 5

<u>Spence v. Staras</u>, 507 F.2d 554 (7th Cir. 1974) .............. 11

<u>State v. Yelton</u>, 87 N.C. App. 554, 361 S.E.2d
753 (1987) ............................................... 9-10


## Rules

Rule 1.7 of the North Carolina Revised Rules
of Professional Conduct ..................................... 5

YMW: 199337.1

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a copy of the foregoing **Memorandum in Opposition to Plaintiff's Motion to Disqualify Defendants' Attorney** was served on the following parties to this action by: [ ] hand delivery  [X] by depositing a copy of the same in the United States Mail postage prepaid and addressed to:

> Jessica Wilson, by and
> through her parent and
> next friend, Douglas
> McPhail
> 615 Kellam Circle
> Fayetteville, NC 28311

This, the 15th day of March, 2004.

YATES, MCLAMB & WEYHER, L.L.P.

By: _____

RYAN M. SHUIRMAN
N.C. State Bar No.: 26746
Attorneys for defendants Brown,
Daskal, and the Cumberland
County Board of Education
P.O. Box 2889
Raleigh, NC 27602
Telephone: (919) 835-0900
Fax:      (919) 835-0910

266 F.Supp.2d 413
(Cite as: 266 F.Supp.2d 413)

**H**

United States District Court,
M.D. North Carolina.

David E. GEORGE, Plaintiff,
v.
Reece Nelson McCLURE, Defendant.

**No. Civ. 100CV00952.**

June 5, 2001.

Plaintiff sued his former business partner, alleging that settlement of plaintiff's prior suit against defendant was induced by fraud. On defendant's motion to dismiss for lack of jurisdiction and plaintiff's motion to **disqualify** defendant's counsel, the District Court, Bullock, J., held that: (1) court had person jurisdiction over defendant; (2) complaint stated fraud claim; and (3) **disqualification** of defendant's **attorney** was appropriate.

Defendant's motion denied, and plaintiff's motion granted.

West Headnotes

**[1] Federal Courts ☞356**
170Bk356 Most Cited Cases

Because plaintiff claimed damages of over $75,000.00 on numerous counts and alleged facts that provided basis for millions of dollars in damages, plaintiff satisfied jurisdictional amount required in diversity case. 28 U.S.C.A. § 1332.

**[2] Constitutional Law ☞305(5)**
92k305(5) Most Cited Cases

**[2] Federal Courts ☞76**
170Bk76 Most Cited Cases

To determine whether court has personal jurisdiction over defendant, court must first determine whether state long-arm statute permits exercise of jurisdiction and, second, whether exercising jurisdiction over defendant violates due process of law. U.S.C.A. Const.Amend. 14; Fed.Rules Civ.Proc.Rule 12(b)(2), 28 U.S.C.A.

**[3] Constitutional Law ☞305(5)**
92k305(5) Most Cited Cases

**[3] Federal Courts ☞76.20**
170Bk76.20 Most Cited Cases

President and sole shareholder of North Carolina corporation had sufficient minimum contacts with North Carolina for court to exercise personal jurisdiction in accordance with due process of law; complaint alleged fraud perpetrated in mediated settlement agreement in connection with lawsuit in North Carolina court, defendant had been resident of North Carolina for over 25 years, underlying lawsuit was based on business transactions entered into by defendant's North Carolina business, most of the alleged fraudulent statements were made in North Carolina, and settlement agreement was entered in North Carolina. U.S.C.A. Const.Amend. 14.

**[4] Fraud ☞36**
184k36 Most Cited Cases

Under North Carolina law, general release and clause in settlement agreement stating that parties were not relying on representations made in connection with reaching the settlement did not bar action brought on grounds of fraud in the inducement.

**[5] Compromise and Settlement ☞8(3)**
89k8(3) Most Cited Cases

Under North Carolina law, if settlement agreement is procured by fraud, requisite meeting of minds is absent.

**[6] Evidence ☞434(8)**
157k434(8) Most Cited Cases

Parol evidence rule does not preclude admission of extrinsic evidence when party seeks to prove that written agreement was executed under circumstances amounting to fraud.

**[7] Release ☞16**
331k16 Most Cited Cases

**[7] Release ☞17(.5)**
331k17(.5) Most Cited Cases

Under North Carolina law, release is subject to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

266 F.Supp.2d 413
**(Cite as: 266 F.Supp.2d 413)**

avoidance by showing that its execution resulted from fraud or mutual mistake.

**[8] Fraud ☜41**
184k41 Most Cited Cases

Complaint properly stated claim for fraud, under North Carolina law; complaint alleged statements upon which plaintiff relied, that these alleged false representations were made with intent to deceive, and that plaintiff reasonably relied on these misrepresentations.

**[9] Limitation of Actions ☜100(1)**
241k100(1) Most Cited Cases

North Carolina's three-year statute of limitations for action grounded in fraud does not run until party bringing action is aware of the fraud or should have been aware of the fraud.

**[10] Federal Civil Procedure ☜1831**
170Ak1831 Most Cited Cases

Whether plaintiff was aware of fraud or should have been aware of fraud, as would commence statute of limitations on fraud claim, was factual determination inappropriate for motion to dismiss.

**[11] Federal Civil Procedure ☜1831**
170Ak1831 Most Cited Cases

Whether plaintiff relied on statements and whether such reliance was reasonable, as required for fraud claim, were questions of fact inappropriate for motion to dismiss.

**[12] Attorney and Client ☜20.1**
45k20.1 Most Cited Cases

**[12] Attorney and Client ☜21.20**
45k21.20 Most Cited Cases

Disqualification of counsel is serious matter which cannot be based on imagined scenarios of conflict, and moving party has high standard of proof to meet in order to prove that counsel should be disqualified.

**[13] Attorney and Client ☜19**
45k19 Most Cited Cases

In close case, court should resolve all doubts in favor of disqualification of counsel.

**[14] Attorney and Client ☜22**
45k22 Most Cited Cases

In action alleging fraudulent inducement of settlement, defendant's **attorney** would be **disqualified; attorney** had been defendant's counsel in lawsuit that resulted in disputed settlement agreement, he was involved in settlement process, was allegedly aware of misrepresentations made by others and made misrepresentations himself in that context and he would most likely be material witness. N.C. State Bar Rules, Ch. 2, Rules 1.7, comment 6, 3.7.
**\*415** Ellis B. Drew, III, Wells Jenkins Lucas & Jenkins, Winston-Salem, NC, for Plaintiff.

Amiel J. Rossabi, Forman Rossabi Black, P.A., Gregory Arthur Wendling, Greensboro, NC, for Defendant.

*MEMORANDUM OPINION*

BULLOCK, District Judge.

This matter is before the court on Defendant Reece Nelson McClure's motion to dismiss Plaintiff David E. George's complaint. Plaintiff alleges claims for relief based on fraud, rescission, unjust enrichment, conversion, unfair and deceptive trade practices, breach of fiduciary duty, constructive trust, and accounting. Plaintiff's motion to disqualify Defendant's counsel is also before the court. For the following reasons, Defendant's motion to dismiss will be denied and Plaintiff's motion to disqualify Defendant's counsel will be granted.

FACTS

Because this matter is before the court on a motion to dismiss, the Plaintiff's version of the facts contained in the complaint will be taken as true despite Defendant's denial of many of Plaintiff's assertions. Plaintiff and Defendant were partners in an interior design business, Reece N. McClure Interior Design. Plaintiff and Defendant shared responsibilities for design decisions and the operation of the business. The business thrived and began receiving commercial design projects which were especially profitable. In the middle of 1992 and early 1993 Thomas Sandefur, Chief Executive

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

266 F.Supp.2d 413                                                Page 3
(Cite as: 266 F.Supp.2d 413)

Officer of Brown & Williamson Tobacco Company, consulted with Plaintiff and Defendant regarding a redesign and redecoration of the Brown & Williamson home headquarters in Louisville, Kentucky. The initial projected cost for the first phase of the project, the executive 26th floor, was $2,000,000.00. A deposit was received by Plaintiff on April 24, 1993, for $1,000,000.00 and was placed in Reece N. McClure Interior Design's account in Winston-Salem, North Carolina.

*416 About this time, Defendant formed a new corporation called Environmental Productions, Inc. Plaintiff believes that this corporation is a sham corporation used in part to defraud Plaintiff by serving as a receptacle for payments funneled from the Brown & Williams job. At this point, the personal relationship between Plaintiff and Defendant began to deteriorate and Defendant allegedly began siphoning partnership funds. Defendant became involved with Brian Peele, who allegedly participated in the scheme to defraud Plaintiff.

Plaintiff subsequently brought suit against McClure and Peele in Forsyth County Superior Court designated as *David E. George v. Reece Nelson McClure and Robert Brian Peele, 94Cvs 1214* (hereinafter the "Lawsuit"). On November 3, 1994, Sandefur and his wife, Crawford Sandefur, filed affidavits in the Lawsuit stating that the Brown & Williamson job had been terminated and that Environmental Productions, Inc., had been hired to finish limited work on the 26th floor. In November 1994, Defendant testified in a video deposition for that case that the Brown & Williamson project had been cancelled.

All three parties to the Lawsuit met for a mediated settlement conference at which time Defendant allegedly represented the following facts: (1) the Brown & Williamson job had been cancelled; (2) Environmental Productions, Inc., was going to finish the job, greatly reduced in scope, realizing no profits; (3) after the small amount of work left for Brown & Williamson was complete, there would be no further work or economic opportunity with the Brown & Williamson project; (4) McClure had no money, the $1,000,000.00 deposit for the Brown & Williamson job and over $1,000,000.00 of accumulated shared assets had been spent; (5) Plaintiff should immediately settle the Lawsuit for a small amount because that was all Defendant could

pay; if Plaintiff did not settle at this time there may be no money in the future, and Plaintiff might even have to help refund monies paid by Brown & Williamson; and (6) the mediated settlement agreement had to state that no partnership ever existed for Defendant's tax purposes only.

Plaintiff claims that he believed these representations at the time they were made, in part because he had witnessed lavish spending by Defendant and Peele. Plaintiff now claims that the Sandefurs' affidavits were false and that McClure's attorney in the Lawsuit, the same attorney representing Defendant in the present case, knew that he was procuring false affidavits. Plaintiff claims that he relied on these false statements when he entered the settlement agreement.

Subsequently, Plaintiff discovered that Defendant's statements as well as those made by the Sandefurs and Defendant's attorney were false. The Brown & Williamson project had not been cancelled and Defendant reaped millions of dollars in profits from that job. Apparently, as with Plaintiff and Defendant, Peele's relationship with Defendant had deteriorated. Plaintiff learned that Peele had filed a lawsuit against McClure in California. Through discovery Peele obtained financial documents allegedly showing that McClure had received millions of dollars from Brown & Williamson after testifying in his deposition for the Lawsuit that the project was cancelled. Peele also provided a sworn statement detailing the fraudulent scheme in which Defendant enlisted Peele to participate.

As a result of Plaintiff's discoveries regarding the alleged false representations made at the settlement conference for the Lawsuit, upon which Plaintiff relied in entering *417 the settlement, Plaintiff has brought this action.

## DISCUSSION

Defendant has moved for dismissal of Plaintiff's claims pursuant to Federal Rules of Civil Procedure 12(b)(1), (2), and (6). Although both parties have attached voluminous documents to their briefs, the court will limit its review to the pleadings because this matter is before the court on a motion to dismiss. Also before the court is Plaintiff's motion to disqualify Defendant's counsel.

[1] The burden of proving subject matter

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

266 F.Supp.2d 413
(Cite as: 266 F.Supp.2d 413)

jurisdiction is on the plaintiff. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir.1991). Under Rule 12(b)(1), the moving party "should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* Plaintiff alleges that this court has proper subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff contends that he is a resident of North Carolina and that Defendant is a resident of Florida and that the amount in controversy exceeds $75,000.00. Defendant concedes diversity of the parties but argues that "the claim does not *in good faith* meet the jurisdictional [sic] required $75,000.00 because Plaintiff does not have a claim whatsoever presented 'in good faith.' " (Def.'s Br. in Support of Mot. to Dismiss at 5). Clearly the jurisdictional fact of the amount in controversy is in dispute. Because Plaintiff claims damages of over $75,000.00 on numerous counts and alleges facts that provide a basis for millions of dollars in damages, Plaintiff has satisfied the jurisdictional amount required in a diversity case under 28 U.S.C. § 1332, and this court has proper subject matter jurisdiction.

[2] To determine whether the court has personal jurisdiction over Defendant pursuant to Federal Rule of Civil Procedure 12(b)(2), the court must conduct a two-part inquiry. First, it must be determined whether the statutes of North Carolina permit the exercise of jurisdiction and, second, whether exercising jurisdiction over Defendant violates due process of law. *Vishay Intertechnology, Inc. v. Delta Int'l Corp.,* 696 F.2d 1062, 1064 (4th Cir.1982). The North Carolina long-arm statute specifically provides that North Carolina jurisdiction is proper when a party has contracted to deliver within North Carolina something of value to the plaintiff. N.C. Gen.Stat. § 1-75.4(5)(c). The North Carolina long-arm statute should be given a liberal construction providing North Carolina courts the full jurisdictional power permitted under federal due process. [FN1] N.C. Gen.Stat. § 1-75.4; *Vishay,* 696 F.2d at 1065; *Dillon v. Numismatic Funding Corp.,* 291 N.C. 674, 231 S.E.2d 629, 630 (1977).

FN1. Defendant does not contest that the North Carolina long-arm statute permits the exercise of jurisdiction. Defendant argues instead that he does not have

sufficient minimum contacts with North Carolina to satisfy due process considerations.

[3] It is well settled that a non-resident defendant must have sufficient "minimum contacts" with the forum state for a court to exercise personal jurisdiction over that defendant in accordance with due process of law. *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Defendant argues that these minimum contacts are lacking because the fact that he is president and sole shareholder of a North Carolina corporation is not sufficient to satisfy notions of fair play and substantial justice. He also contends that North Carolina lacks an interest and notes the "bogus nature of *418 Plaintiff's Complaint." Defendant does not address the fact that the gravamen of this case is fraud perpetrated in the mediated settlement agreement in connection with a lawsuit in a North Carolina court. Defendant was a resident of North Carolina for over twenty-five years. The underlying Lawsuit was based on business transactions entered into by Defendant's North Carolina business. Most of the alleged fraudulent statements were made in North Carolina. The settlement agreement was entered in North Carolina. It does not offend notions of fair play and substantial justice to exercise jurisdiction over a non-resident when that person allegedly made misrepresentations in this state in connection with a lawsuit in this state. Defendant has sufficient minimum contacts with North Carolina for this court to exercise personal jurisdiction in accordance with due process of law.

Dismissal under Rule 12(b)(6) is improper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In considering a motion to dismiss, the court accepts as true all well-pleaded allegations and views the complaint in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993). " 'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *Revene v. Charles County Comm'rs,* 882 F.2d 870, 872 (4th Cir.1989) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

966 F.2d 142
140 L.R.R.M. (BNA) 2564, 30 Wage & Hour Cas. (BNA) 1556, 122 Lab.Cas. P 35,689
**(Cite as: 966 F.2d 142)**

**H**

United States Court of Appeals,
Fourth Circuit.

Michelle SHAFFER; Lionel Alexander; Angela
Andrews; Joseph Banks; Cynthia
Bailey; Maria Y. Bailey; Kathy Baker; John
Bane; Katherine Barnette; Kathy
Baston; Victor Bell; David L. Bogart; Baron
Booker; Carolyn Bottoms; Evey
M. Brake; Patrice Branch; Ruben Brown; Frank
W. Campbell; Glenn W.
Campbell; Regina Carter; Quanda Carter; John
Carver; Murray Edward Clark;
Justin Cole; Floyd Harvey Copeland, III; Katheryn
Council; Charles R.
Craig; M. Michelle Davis; Clarence J. Dickerson;
Anthony B. Ellerbe; Harold
Epperson; Anthony B. Faison; Robert
Ferry-Leeper; Alfretta Kay Flax;
Catherine Lynn Foster; Charlene Fox; Floyd
Gamby; Marilyn Gardner; James
Gonyer, Jr.; Edna L. Gordon; Thomas W. Graham;
Marvin Greene; Daniel Edward
Greer; Tony Hardie; Katie Hardy; Rhonda Harris;
Harold F. Hartman, III;
Richard E. Haughton; Paula Hayes; Daryll
Henderson; Tammy C. Henry;
Marianne Hierspiel; Grant Holcomb; Vickie L.
Jiles; John A. Johnson; Dwight
Jones; Margaret Jones; Cynthia R. Kirkendoll;
Christopher L. Kirkland;
Cheryl Koenig; Johnny Kon; Robert Lee Lindsay;
Robbin R. Love; Darlene L.
Mabrey; Lois J. MacPhee; Thomas Mallory;
Joseph W. Manning, Jr.; Jennifer
Lynn Marcou; Phil Martin, Jr.; Thurman
Massenburg; Karen Matthews; Bobbie
Sue Melzer; James J. Mills, Jr.; Delores Moore;
Terry Nuhfer; Chris
Olworth; William T. Page, Jr.; Neal Paris; Phyllis
Pearson; Tonya Y.
Peguese; James F. Percy; Rose M. Poole; Delores
F. Prater; Shenice A.
Pritchett; Robert Puchalski; Kathy Reale; Peggy
Moore Reed; James C. Reed,
Jr.; Rachel Robertson; Francis Robinson;
Antoinette Robinson; Gale Rogers;
John Charles Salldin; Christine N. Sawyer;
Virginia Schnoor; Patricia G.
Schoolcraft; Janathan A. Sherrod; Jaime P.
Shoemaker; Angela M. Sifford;

Cheryl A. Smith; Jackie Spartley; Bertha Louise
Stevenson; Patricia L.
Stewart; James H. Stiers; Doretha L. Stith; Angela
M. Stone; Richard A.
Strader; Carla R. Tory; Amy Wilding; Amy Lynn
Williams; Roslyn Williams;
Shannon D. Williams; Tammy C. Williams; Kay
W. Willis; Deborah Wilt; Barry
K. Wood; Sharon Wormley; Cavanaugh L. Wrim,
Plaintiffs-Appellants,
and
Stephanie R. Brooks, Plaintiff,
v.
FARM FRESH, INCORPORATED,
Defendant-Appellee.

**Nos. 91-2086, CA-90-1607-N.**

Argued Feb. 3, 1992.
Decided May 22, 1992.

Fair Labor Standards Act class action was brought.
The United States District Court for the Eastern
District of Virginia, J. Calvitt Clarke, Jr., Senior
District Judge, 759 F.Supp. 1185, disqualified
counsel for plaintiffs. Plaintiffs appealed. The
Court of Appeals, Phillips, Circuit Judge, held that
counsel would not be disqualified under Virginia's
conflict of interest rule.

Vacated and remanded.

West Headnotes

**[1] Federal Courts ⟜776**
170Bk776 Most Cited Cases

Court of Appeals reviews district court order
disqualifying counsel for conflict of interest de
novo.

**[2] Federal Courts ⟜763.1**
170Bk763.1 Most Cited Cases
(Formerly 170Bk763)

In reviewing district court order disqualifying
counsel for conflict of interest, Court of Appeals
must determine whether district court's
disqualification order was predicated upon proper
application of applicable ethical principles.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

966 F.2d 142
140 L.R.R.M. (BNA) 2564, 30 Wage & Hour Cas. (BNA) 1556, 122 Lab.Cas. P 35,689
(Cite as: 966 F.2d 142)

Page 2

**[3] Attorney and Client** 🔑21.5(4)
45k21.5(4) Most Cited Cases

Counsel for employee bringing class action under Fair Labor Standards Act would not be disqualified under Virginia's conflict of interest rule, even though counsel also represented a union which was conducting organizational campaign targeting the employees; scenario posited by the district court, requiring offer of favorable settlement conditioned on confidentiality, decision by union to influence counsel to reject settlement, and counsel's decision to default on their ethical obligation, was too attenuated. Va.Code of Prof.Resp., DR 5- 105(B); Fair Labor Standards Act of 1938, § 1 et seq., 29 U.S.C.A. § 201 et seq.

**[4] Labor Relations** 🔑130
232Ak130 Most Cited Cases

District court's funding statement was improper to the extent it was intended to operate as an injunction against counsel's use of union funding for Fair Labor Standards Act class action by nonunion employees; it could not be properly found on the record that union's contemporaneous organizing drive was "likely" to result in subversion of counsel's fair and effective representation of the employees. Fair Labor Standards Act of 1938, § 1 et seq., 29 U.S.C.A. § 201 et seq.; Va.Code of Prof.Resp., DR 5-105.
*143 Laurence Gold (James B. Coppess, on brief), Washington, D.C., for plaintiffs-appellants.

Thomas Joseph Flaherty, Hunton & Williams, Richmond, Va. (Michael P. Oates, Hunton & Williams, Richmond, Va., A.W. VanderMeer, Jr., Sharon S. Goodwyn, Hunton & Williams, Norfolk, Va., on brief), for defendant-appellee.

Before PHILLIPS and MURNAGHAN, Circuit Judges, and OSTEEN, United States District Judge for the Middle District of North Carolina, sitting by designation.

PHILLIPS, Circuit Judge:

Michelle Shaffer appeals the judgment of the district court dismissing without prejudice her

action against Farm Fresh under the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. (FLSA). Shaffer, on behalf of herself and 125 consenting class members, *144 challenges the following district court rulings: (1) an order disqualifying Shaffer's counsel, Baptiste & Wilder, under Virginia's conflict of interest rule (Disqualification Order); (2) a statement made by the district court during a hearing that Local 400 of the United Food and Commercial Workers could no longer pay Shaffer's litigation costs (Funding Statement); (3) an order denying Shaffer's request to notify potential class members (Notice Order); and (4) an order dismissing without prejudice Shaffer's action and striking without prejudice the consents of 125 class members (Dismissal Order). We conclude that disqualification was not warranted and that in consequence the district court's further rulings, including dismissal of the action, cannot stand. Accordingly, we reverse on all points and remand for further proceedings.

I

Shaffer, on behalf of 125 present and former employees of Farm Fresh, brought this action against Farm Fresh under § 16(b) of the FLSA, 29 U.S.C. § 216(b). Section 16(b) enables aggrieved employees to obtain class relief against employers, provided each class member consents to be bound by the judgment. Shaffer alleged that Farm Fresh violated the FLSA by requiring employees to work "off the clock" after employees have "punched out," failing to pay employees overtime wages, requiring employees to work through their breaks without compensation, altering employee time records, and threatening employees who joined this lawsuit.

The action originated in contacts between Farm Fresh employees and representatives of Local 400 of the United Food and Commercial Workers (Union). Since 1986, the Union has conducted an organizing campaign to become the exclusive bargaining representative of Farm Fresh employees under the National Labor Relations Act (NLRA), 29 U.S.C. § 141, et seq. Farm Fresh employees and Union representatives discussed Farm Fresh's business practices, and the Union urged its primary outside counsel, Baptiste & Wilder, to represent the employees. The Union agreed to pay all litigation costs, with the expectation that if Shaffer prevailed, the court would order Farm Fresh to pay fees under

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

966 F.2d 142
140 L.R.R.M. (BNA) 2564, 30 Wage & Hour Cas. (BNA) 1556, 122 Lab.Cas. P 35,689
**(Cite as: 966 F.2d 142)**

§ 16(b).

The action was filed in September of 1990, on behalf of Farm Fresh employees Stephanie Brooks and Michelle Shaffer and a class of similarly situated employees. [FN1] With the help of the Union, Baptiste & Wilder circulated questionnaires and consent forms to Farm Fresh employees. Along with these materials, the Union distributed flyers discussing the benefits of Union representation and the Union's involvement in the suit. [FN2]

> FN1. Shaffer originally filed her complaint with the Department of Labor. The Department of Labor advised her to obtain a private attorney. She approached five or six attorneys without success, and when she approached the Union for assistance, the Union told her to contact Baptiste & Wilder.

> FN2. One flyer read in part:
> Do you have this problem--lots of overtime, with little to show for it on your paycheck?
> You KNOW what your problem is: You need a UNION.
> Another flyer, signed by the President of the Union, read in part:
> You should know by now that a lawsuit has been filed on behalf of Farm Fresh employees to get back the money Farm Fresh has cheated you out of by making you work off the clock.
> Don't be fooled and don't be intimidated by Farm Fresh promises and Farm Fresh threats. Hundreds of employees have already come forward to be plaintiffs in this lawsuit and the number continues to grow.
> REMEMBER--YOU HAVE TO SIGN A CONSENT FORM, IF YOU HOPE TO GET BACK THE MONEY THAT FARM FRESH OWES YOU IF YOU'VE WORKED OFF THE CLOCK.
> The Union has already made a difference--and this is just the beginning.

After securing 125 consents, Shaffer moved for court approval of a notice to be sent to a class of 27,000 potential class members. In its Notice Order, the district court denied the request and ordered "that neither the parties nor the Union, nor anyone acting for them, in their interest, or at their behest, conduct any further activity *145 to attempt to recruit additional plaintiffs in this action until further order of the Court." The court took issue with the Union's involvement in securing the first 125 consents, suggesting that the Union may have misled some of the opt-in plaintiffs with its "inflammatory and misleading" flyers. The court also expressed concern that the Union might be pursuing the FLSA action to further its organizational drive.

Farm Fresh later moved to disqualify Baptiste & Wilder, arguing that the firm's representation of the Union and Shaffer created a conflict of interest which would deprive Shaffer of adequate representation. The district court entered its Disqualification Order granting the motion in February 1991, 759 F.Supp. 1185. The court characterized the lawsuit as an attempt by the Union to garner support for its organizational drive and found that Baptiste & Wilder's multiple representation violated DR 5-105 of the Virginia Code of Professional Responsibility, which governs conduct of attorneys practicing before the District Court for the Eastern District of Virginia.

The court recognized that, while the Union and the Farm Fresh employees share an interest in recovering lost wages, the Union may have additional motives. The court hypothesized a potential conflict if, for instance, Farm Fresh proposed a quick, confidential settlement. While the settlement might be favorable to the employees, a quiet settlement would undermine the Union's interest in publicizing a successful outcome. As a result of its association with Baptiste & Wilder and its financial support of the litigation, the Union could shorten or lengthen the case to coincide with the timing of its organizational drive.

Following a hearing in April 1991, the court expressly prohibited the Union from financing the lawsuit. The court entered an order giving Shaffer, Brooks, and the class members one week to secure an attorney willing to accept the case without the Union as a funding source. When the employees

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

failed to do so and Shaffer refused to proceed *pro se,* the court entered the Dismissal Order, dismissing Shaffer's claim without prejudice, dismissing Brooks' claim with prejudice, [FN3] and striking without prejudice the opt-in consents filed by the class members. This appeal followed.

> FN3. Brooks' claim was dismissed because she failed to appear at a scheduled deposition and she failed to respond to the district court's disqualification order. She is not appealing the dismissal.

## II

Because the district court rulings depend on the finding of a conflict of interest in the Disqualification Order, we address that order first. We will then consider the Funding Statement, the Notice Order, and the Dismissal Order.

## A

[1][2] We review a district court order disqualifying counsel for a conflict of interest *de novo. Aetna Casualty & Surety Co. v. United States,* 570 F.2d 1197, 1200 (4th Cir.1978). We must determine whether the district court's disqualification order was predicated upon a proper application of applicable ethical principles. *Id.*

[3] Virginia's Disciplinary Rule 5-105(B) provides:
  A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client....
Rules of the Supreme Court of Virginia, Part 6, § II, Canon 5, DR 5- 105 (Michie 1991). We have held that disqualification of a litigant's chosen counsel for violation of an ethical canon such as Virginia's DR 5-105(B) may not be rested on mere speculation that a chain of events whose occurrence theoretically could lead counsel to act counter to his client's interests might in fact occur. *Aetna,* 570 F.2d at 1200-1202. Although this canon proscribes multiple employment not only when counsel's exercise of independent professional judgment "will be" adversely affected, but when it is "likely to be," some stronger objective indicator--**\*146** even of

"likelihood"--than simple judicial intuition is needed to warrant the drastic step of disqualification of counsel. How strong in a particular case is of course a matter of judgment, but we have no doubt that the indicators here are not sufficiently strong; indeed, we see none other than the ever-present threat of human cupidity in all the affairs of life. That obviously cannot suffice.

Certainly the district court pointed to no objective indicators that the chain of events it hypothesized *might* occur were even incipiently underway, or would "likely" occur. The scenario posited by the court instead had simply to assume the complete unfolding of a series of discrete events, no one of which could be more than the basis of speculation at this point: an offer of settlement favorable to plaintiffs which Farm Fresh required be kept confidential; failure of the Union by that time to have organized the Farm Fresh employees; a decision by the Union to influence counsel to reject the favorable settlement in order to further Union interests; and a decision by counsel to default on their ethical obligation in response.

This is too attenuated a basis upon which to disqualify counsel. Not only are positive indicators even of the "likely" development of the hypothesized conflict of interest weak or non-existent, powerful safeguards against its actual development manifestly are present. First off, there is the ethical obligation of counsel. That has now been highlighted by Farm Fresh's motion to disqualify which has prompted specific assurances in response. That obligation's force may not be discounted. Beyond that lies the deterrent effect of sanctions--also highlighted by the proceeding--available were counsel nevertheless ever tempted at the Union's insistence deliberately to delay settlement at the expense of its litigation clients. Although a court may not use the threat of sanctions directly to force settlement of a case, *Kothe v. Smith,* 771 F.2d 667, 669 (2d Cir.1985), § 1927 sanctions may be appropriate against counsel who needlessly and vexatiously "multiples a proceeding" by rejecting a settlement offer that would afford complete relief to his client. *Kline v. Wolf,* 702 F.2d 400, 405 (2d Cir.1983). Particularly here, with the fat of possible specific ethical misconduct now formally in the fire, it is hard to imagine that it would occur--even if, as we do not suggest, there were any predisposition in that

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

direction.

These are practical considerations that we must take into account, along with a party's ability to secure alternative representation, in assessing the propriety of disqualifying counsel on "likely" conflict grounds. *Aetna,* 570 F.2d at 1200-02. The drastic nature of disqualification requires that courts avoid overly-mechanical adherence to disciplinary canons at the expense of litigants' rights freely to choose their counsel; and that they always remain mindful of the opposing possibility of misuse of disqualification motions for strategic reasons. *See Woods v. Covington County Bank,* 537 F.2d 804, 813 (5th Cir.1976).

Farm Fresh has made, and the district court has accepted as at least a likelihood, the suggestion that counsel might engage in a most egregious, specific form of unethical conduct. For the reasons above given, we conclude that even the likelihood of its actual occurrence is much too speculative on the present record to warrant disqualification. The question of actual or more imminently threatened ethical misconduct resulting from multiple employment of course remains always subject to inquiry.

B

[4] During the April 1991 hearing the district court stated that "under the rules of the Court ... the union can no longer finance this litigation." (App. 78). While the court did not incorporate this in a formal order, the parties both treat the court's Funding Statement as if it were. To the extent that the Funding Statement could be considered part of a binding order, we reverse. Because the district court based the funding prohibition as well as its disqualification order on an interpretation and application of Virginia's canons of professional responsibility, we also review that ruling *de novo.*

*147 We have earlier concluded that Baptiste & Wilder's joint representation of the Union and the Farm Fresh employees could not properly be found on the present record "likely" to cause those counsel to subvert their litigation clients' interests in deference to union influence. For the same reasons, we conclude that it could not properly be found on the present record that the union's contemporaneous organizing drive is "likely" to

result in a subversion of Baptiste & Wilder's fair and effective representation of the Farm Fresh employees. [FN4] Therefore, we reverse the district court's Funding Statement to the extent it was intended to operate as an injunction against Shaffer's use of Union funding for the litigation.

> FN4. In view of this conclusion, we need not reach the question whether the Union has a protected first amendment right to fund litigation under the line of cases including *Mine Workers v. Illinois Bar,* 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) and *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

C

We review for an abuse of discretion the district court's Notice Order, which prohibited Shaffer from contacting potential class members. *Hoffmann-La Roche, Inc. v. Sperling,* 493 U.S. 165, 169-70, 110 S.Ct. 482, 486, 107 L.Ed.2d 480 (1989) ("district courts have discretion, in appropriate cases, to implement § 216(b) ... by facilitating notice to potential plaintiffs."). [FN5]

> FN5. *Hoffman* was brought under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* However, since the ADEA incorporates § 16(b) of the FLSA into its enforcement scheme, the same rules govern judicial management of class actions under both statutes.

Because we have concluded that neither the disqualification of Baptiste & Wilder nor the prohibition on Union funding of this litigation was warranted at this time, we can identify no reason for continuing the district court's ban on communication between Shaffer and potential class members. The benefits of the class action provisions of § 16(b) "depend on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." *Id.* at 170, 110 S.Ct. at 486.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

966 F.2d 142
140 L.R.R.M. (BNA) 2564, 30 Wage & Hour Cas. (BNA) 1556, 122 Lab.Cas. P 35,689
**(Cite as: 966 F.2d 142)**

Accordingly, we vacate the district court's Notice Order and remand for lower court approval of an appropriate notice statement and consent form.

### D

The claims of Shaffer and the 125 opt-in class members were dismissed because Shaffer was unable to secure alternative counsel and she was unwilling to proceed *pro se.* That basis for dismissal has now been voided by our conclusion that Shaffer's chosen counsel could not properly be disqualified. We therefore vacate the district court's Dismissal Order with respect to Shaffer and the plaintiff class. The order of course stands as to Brooks, who did not appeal.

### III

For the foregoing reasons, we vacate the Disqualification Order and the Funding Statement. Baptiste & Wilder may continue to serve as counsel to Shaffer and the plaintiff class, and the Union may continue funding the litigation. We vacate the Notice Order and remand with instructions for the district court to approve a balanced notice statement and consent form for distribution to the 27,000 potential class members. Finally, we vacate the Dismissal Order with respect to Shaffer and the plaintiff class.

*VACATED AND REMANDED.*

966 F.2d 142, 140 L.R.R.M. (BNA) 2564, 30 Wage & Hour Cas. (BNA) 1556, 122 Lab.Cas. P 35,689

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

590 F.2d 1241
**(Cite as: 590 F.2d 1241)**

▷
Briefs and Other Related Documents

United States Court of Appeals,
Second Circuit.

BOARD OF EDUCATION of the CITY OF NEW
YORK and Irving Anker, Chancellor of City
School District, Plaintiffs,
v.
Ewald NYQUIST, Commissioner of Education of
the State of New York, New York
State Division of Human Rights, Defendants,
Claire Cohen, Cynthia Crawford, and Joyce
Silversmith, on behalf of themselves
and on behalf of all female Health and Physical
Education Teachers in the New
York City School System, Defendants-Appellees,
Melvin Berman, Noah Gelfond and Daniel Gavrin,
on behalf of themselves and on
behalf of all male Health and Physical Education
Teachers in the New York City
School System, Defendants-Appellants.

**No. 30, Docket 78-6055.**

Argued Sept. 14, 1978.
Decided Jan. 9, 1979.

City board of education and chancellor of city
school district brought declaratory judgment action
to obtain a determination whether the school district
was required to use separate seniority lists for male
and female health and physical education teachers
for the purpose of layoffs. Certain male and female
health and physical education teachers were named
as defendants to represent the affected classes.
Defendants asserted counterclaims and cross claims
and the female defendants moved for
disqualification of the male defendants' attorney.
The United States District Court for the Southern
District of New York, Lasker, J., entered an order
disqualifying the attorney, and the male defendants
appealed. The Court of Appeals, Feinberg, Circuit
Judge, held that: (1) under the circumstances, the
First Amendment did not protect the right of any
particular attorney to represent the male defendants
in court, and (2) in absence of any claim that the
male defendants' attorney felt any sense of loyalty to
the women that would undermine his representation
of the men and where there was no evidence that his

representation was anything less than vigorous or
that the men had gained any unfair advantage
through their attorney's access to privileged
information about the women, any slight appearance
of impropriety that might arise from the fact that the
attorney representing the male defendants was
general counsel for a teachers' membership
association that received financial assistance from
the union which represented both the male and
female teachers in collective bargaining was not
sufficient to warrant disqualification.

Order reversed and matter remanded.

Mansfield, Circuit Judge, concurred and filed
opinion.

West Headnotes

**[1] Constitutional Law** ⬥**82(6.1)**
92k82(6.1) Most Cited Cases
(Formerly 92k82(6))

Where male health and physical education teachers
were defendants and would have litigated their
point of view regardless of what attorney
represented them and where the male teachers had
sought out the attorney who was subject of
disqualification motion by female codefendants,
while the male teachers had a right to obtain legal
advice and representation, the First Amendment did
not protect the right of their chosen attorney to
represent them in court, and, therefore, did not
constrain consideration of the propriety of the
attorney's representation or of disqualification order
that was entered by district court on motion of
female codefendants. U.S.C.A.Const. Amend. 1.

**[2] Attorney and Client** ⬥**20.1**
45k20.1 Most Cited Cases
(Formerly 45k20)

**[2] Attorney and Client** ⬥**21**
45k21 Most Cited Cases

Weighing the needs of efficient judicial
administration against the potential advantage of
immediate preventive measures, courts should be
quite hesitant to disqualify an attorney, unless the
attorney's conduct tends to taint the underlying trial
by disturbing the balance of the presentations either
because of conflicts of interests or because the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

590 F.2d 1241
**(Cite as: 590 F.2d 1241)**

attorney is potentially in a position to use privileged information concerning the other side gained through prior representation. ABA Code of Professional Responsibility, Canons 4, 5, 9.

**[3] Federal Courts** ☞553
170Bk553 Most Cited Cases

An order granting a motion to disqualify an attorney is appealable.

**[4] Attorney and Client** ☞21.5(4)
45k21.5(4) Most Cited Cases
(Formerly 45k20)

In declaratory judgment action presenting question whether school district was required to use separate seniority lists for male and female health and physical education teachers for the purpose of layoffs, in absence of any evidence that the attorney's representation of the male codefendants was less than vigorous and where there was no claim that the male codefendants gained an unfair advantage through any access to privileged information about female defendants, it was inappropriate for district court to grant motion of female defendants to disqualify the attorney representing the male teachers on the ground that the attorney was general counsel for an organization that received financial assistance from union which represented both the male and female teachers in collective bargaining.

**[5] Attorney and Client** ☞19
45k19 Most Cited Cases
(Formerly 45k32)

When there is no claim that the trial will be tainted, the appearance of impropriety is, except in the rarest cases, too slender a reed on which to rest an order disqualifying an attorney; this is particularly true when the appearance of impropriety is not very clear.
*1242 Thomas C. Greble, Glen Cove, N. Y. (James R. Sandner, New York City, of counsel), for defendants-appellants.

Kenneth E. Gordon, New York City (Gordon & Schechtman, Murray A. Gordon, New York City, of counsel), for defendants-appellees.

*1243 Before FEINBERG, MANSFIELD and

SMITH, Circuit Judges.

FEINBERG, Circuit Judge:

This unusual case presents difficult questions regarding the appropriate role of federal courts when called upon by disqualification motions to evaluate the conduct of attorneys who appear before them. Three male Health and Physical Education teachers (HPETs) in the New York City school system appeal from an order of the United States District Court for the Southern District of New York, Morris E. Lasker, J., disqualifying their counsel upon the motion of three female HPETs. Appellant male teachers claim that the order was an abuse of discretion because it disregarded their constitutional rights, and was without any sound basis. For reasons set forth below, we hold that the motion to disqualify should have been denied, and we therefore reverse the order of the district court.

I

The contending parties on appeal are the male and female HPETs are all defendants in this declaratory judgment action brought by the Board of Education of the City of New York and the Chancellor of the City School District. In February 1977, these plaintiffs found themselves in the middle of apparently contradictory positions held by the Commissioner of Education of the State of New York [FN1] and the office of Civil Rights of the Department of Health, Education and Welfare (HEW). In a case involving one of these appellants, the State Commissioner had ruled that the use of separate seniority lists for male and female HPETs for the purpose of layoffs was illegal.[FN2] Shortly thereafter, HEW initially indicated to the Board that HEW took exactly the contrary view, that merger of the lists would violate Title IX of the Education Amendments of 1972, 20 U.S.C. ss 1681 et seq. Caught in this apparent dilemma, plaintiffs provisionally merged the seniority lists of male and female HPETs and commenced this action for a declaratory judgment in which all concerned parties would be present. The complaint named as defendants HEW and its Secretary,[FN3] the New York State Commissioner of Education, the State Division of Human Rights, three named male HPETs, individually and as representatives of all male HPETs, and three named female HPETs,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

590 F.2d 1241
(Cite as: 590 F.2d 1241)

Page 3

individually and as representatives of all female HPETs. The male and female defendants have asserted counterclaims and cross-claims. The relief sought by plaintiffs is a judgment declaring that the provisional policy of merging the seniority lists, effective February 1, 1977 but not retroactively, is lawful.

> FN1. At that time, the Commissioner was Ewald Nyquist.

> FN2. In the Matter of the Appeal of Daniel Gavrin, No. 9321 (Oct. 5, 1976).

> FN3. These defendants have since been dismissed from the case by Judge Lasker.

The two classes of defendants are the actual contending parties in this litigation. The male HPETs allege that maintaining separate seniority lists for male and female HPETs is illegal and that:

> all defendant male Health and Physical Education teachers who were laid off on or after September 1, 1975, are entitled to reinstatement with back pay and all other retroactive benefits incident to their positions to the date of their layoff if less senior female teachers were retained at that time or at any time thereafter.

The female HPETs allege that their seniority status perpetuates past discriminatory practices of plaintiffs and that if the provisional merged seniority list is used for layoff purposes "it will result in the layoff of at least six times as many female HPETs as male HPETs." The stakes in the lawsuit are obviously high.

The male HPETs are represented in this action by James R. Sandner, Esq., who is also General Counsel of New York State United Teachers (NYSUT). That organization is an unincorporated membership association of approximately 180,000 teachers, librarians, guidance counsellors and other *1244 school related employees of the almost 800 school districts in New York State. [FN4] We are told that in each of the school districts there is a separate local union, which is the exclusive bargaining representative for employees in that unit. The majority of these individual unions have chosen to affiliate themselves with NYSUT, but the

latter does not collectively bargain for any public employees. It does, however, provide a number of services to its members, including a legal service program under the direction and control of Mr. Sandner. Both the male and female HPETs are represented in collective bargaining by the American Federation of Teachers (AFT), to whom they pay dues. A portion of the dues paid to the AFT is remitted to NYSUT, which, at least in part, apparently finances the legal service program.

> FN4. Some NYSUT members are employees of private schools and universities.

Under the program, NYSUT's members may apply to obtain legal representation free of charge. Mr. Sandner and his staff may take an applicant's case when, in their judgment, the claim is both job-related and meritorious. It is through this procedure that the male defendants retained Mr. Sandner as their attorney. NYSUT itself, however, has taken no position on the merits or on any other issue in this litigation.

The female HPETs moved to disqualify Mr. Sandner as counsel for the male HPETs or, in the alternative, to require NYSUT to furnish counsel for the female teachers. Judge Lasker concluded that "the female teachers are paying, in part, for their opponents' legal expenses." This violated "at least the spirit, if not the letter, of Canon 9 of the Code of Professional Responsibility that 'A lawyer should avoid even the appearance of impropriety.' " Accordingly, the judge granted the motion and this appeal by the male HPETs followed.

II

Appellants' briefs discuss at length various Supreme Court cases dealing with the rights of associational free speech, group-sponsored legal action and First Amendment considerations, e. g., United Transportation Union v. Michigan, 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971); United Mine Workers v. Illinois State Bar Ass'n, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). These

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

590 F.2d 1241
(Cite as: 590 F.2d 1241)

issues are not substantially implicated on this appeal.

Button established as part of the First Amendment freedoms of association and political expression the right of a group to litigate controversial points of view in court free of governmental action purporting to regulate the practice of law. Here, however, NYSUT has made no effort to appear in the litigation either as a party or as an amicus. And indeed, appellants repeatedly insist that NYSUT has taken no position on any issue in this litigation. Since there has been no activity by the group, the Button principle is not applicable here.

Transportation Union, Mine Workers and Trainmen hold that a state may not, in the guise of regulating the practice of law, consistent with the First Amendment prevent efforts of a union to provide its members practical and economical access to courts to press work-related personal injury claims. Those cases establish the right to engage in "collective activity undertaken to obtain meaningful access to the courts," Transportation Union, supra, 401 U.S. at 585, 91 S.Ct. at 1082, where the members of the group are at least substantially united in interest. None of the claims asserted with the aid of those legal plans would, if successful, have disadvantaged any union member. In contrast, this case presents a seniority dispute where the real adversaries are union members. It is thus difficult to characterize Mr. Sandner's representation of the men as "collective activity" of the group within the meaning of those cases.[FN5] *1245 It is true that also underlying those cases "was the Court's concern that the aggrieved receive information regarding their legal rights and the means of effectuating them." See Bates v. State Bar of Arizona, 433 U.S. 350, 376 n. 32, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). But here there is no claim that the male defendants were unaware of their legal rights.

FN5. Nor is there here the need to provide representation to the men in order to redress an imbalance in legal resources. In the Supreme Court's group legal plan cases, there was evidence that the plans' purpose was to combat the overreaching by both employers and members of the bar that had in the past effectively thwarted recovery of adequate compensation for injuries. Since the contending parties here are all union members, the men's resources are presumably comparable to their adversaries'.

Also not controlling, though not necessarily irrelevant, are the fair representation cases, e. g., Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), discussed by appellants. Those cases hold that, in the context of a union's duty fairly to represent the bargaining unit, a union may, if in good faith, assert a position that benefits some of its members to the detriment of others. Since NYSUT has taken no position on the merits, it is far from clear that the union's right to take a position, established by those cases, is implicated here.

Appellants suggest that the recent Supreme Court decision in In re Primus, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978) supports the view that an individual attorney like Mr. Sandner has a First Amendment right to make his views known in the courts even though his conduct in that direction might otherwise breach ethical canons. In Primus, a lawyer, who was also an officer of the Columbia, South Carolina branch of the American Civil Liberties Union (ACLU), orally suggested the possibility of a lawsuit to a woman who had been sterilized as a condition of continued state medical assistance. This was followed by a letter offering the ACLU's free legal assistance. The Supreme Court described appellant's actions as "undertaken to express personal political beliefs and to advance the civil-liberties objectives of the ACLU." 436 U.S. at 422, 98 S.Ct. at 1900. The Court held that attorney Primus's activities so characterized could not be punished as "solicitation" without violating First Amendment freedoms. While the language just quoted refers to the attorney's "personal political beliefs," the main emphasis in the Court's opinion was that the activities under question were "on behalf of the ACLU," Id. at 432, 98 S.Ct. 1893, and were protected under the freedom of association cases already referred to.

[1] We doubt that the principle of Primus extends to control this case. The freedom of association cases are distinguishable for the reasons already given. To the extent that Primus protects simply a lawyer's First Amendment rights, the attorney there was encouraging the airing in court of a point of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

590 F.2d 1241
**(Cite as: 590 F.2d 1241)**

view she believed in, that otherwise probably would not have been asserted by the potential plaintiff with whom she communicated. By contrast, Mr. Sandner's activity here was not really of that informative character. The male HPETs he represents are defendants and would have litigated their point of view (and Mr. Sandner's) regardless of his input. Indeed, it should be noted that the male HPETs sought out Mr. Sandner, not the other way around. Primus does not suggest that an attorney has a First Amendment right to conduct any particular representation, in the face of ethical proscriptions to the contrary, in the absence of any showing that such representation is necessary to facilitate assertion of a specific point of view in court.

Thus, while the male defendants have a right to obtain legal advice and representation, we do not believe that on these facts the First Amendment protects the right of a particular attorney to represent them in court. We thus conclude that the First Amendment does not constrain consideration of the propriety of Mr. Sandner's representation and the disqualification order, to which we now turn.

III

We begin the discussion by noting that, curiously, the power of the federal courts to *1246 disqualify attorneys in litigation pending before them has long been assumed without discussion, see, e. g., General Contract Purchase Corp. v. Armour, 125 F.2d 147, 149 (5th Cir. 1942); United States v. Bishop, 90 F.2d 65, 66 (6th Cir. 1937); Brown v. Miller, 52 App.D.C. 330, 286 F. 994, 997 (1923); T. C. & Theatre Corp. v. Warner Bros. Pictures, 113 F.Supp. 265, 271 n. 15 (S.D.N.Y.1953), and attention has focused on identifying the circumstances in which exercise of the power is appropriate. Our reading of the cases in this circuit suggests that we have utilized the power of trial judges to disqualify counsel where necessary to preserve the integrity of the adversary process in actions before them. In other words, with rare exceptions disqualification has been ordered only in essentially two kinds of cases: (1) where an attorney's conflict of interests in violation of Canons 5 and 9 of the Code of Professional Responsibility [FN6] undermines the court's confidence in the vigor of the attorney's representation of his client, see, e. g., Fund of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d 225 (2d Cir. 1977); Cinema 5, Ltd. v. Cinerama, Inc., 528 F.2d 1384 (2d Cir. 1976), or

more commonly (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation, for example, in violation of Canons 4 and 9,[FN7] thus giving his present client an unfair advantage, see, e. g., Fund of Funds, Ltd. v. Arthur Andersen & Co., supra; Emle Industries, Inc. v. Patentex, Inc., 478 F.2d 562 (2d Cir. 1973). In such cases, we note Chief Judge Kaufman's oft-quoted admonition that,

> FN6. Canon 5 provides:
> A lawyer should exercise independent judgment on behalf of a client.
> Canon 9 provides:
> A lawyer should avoid even the appearance of professional impropriety.

> FN7. Canon 4 provides:
> A lawyer should preserve the confidences and secrets of a client.

When dealing with ethical principles, . . . we cannot paint with broad strokes. The lines are fine and must be so marked. Guideposts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after a painstaking analysis of the facts and precise application of precedent.

Fund of Funds, Ltd., supra, 567 F.2d at 227, quoting United States v. Standard Oil Co., 136 F.Supp. 345, 367 (S.D.N.Y.1955). But in other kinds of cases, we have shown considerable reluctance to disqualify attorneys despite misgivings about the attorney's conduct. See, e. g., W. T. Grant Co. v. Haines, 531 F.2d 671 (2d Cir. 1976); Ceramco, Inc. v. Lee Pharmaceuticals, 510 F.2d 268 (2d Cir. 1975). This reluctance probably derives from the fact that disqualification has an immediate adverse effect on the client by separating him from counsel of his choice, and that disqualification motions are often interposed for tactical reasons. See Allegaert v. Perot, 565 F.2d 246, 251 (2d Cir. 1977); J. P. Foley & Co., Inc. v. Vanderbilt, 523 F.2d 1357, 1360 (2d Cir. 1975) (Gurfein, J., concurring). And even when made in the best of faith, such motions inevitably cause delay. For example, this lawsuit has been at a standstill now for close to a year.

[2] Weighing the needs of efficient judicial

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

590 F.2d 1241
(Cite as: 590 F.2d 1241)

administration against the potential advantage of immediate preventive measures, we believe that unless an attorney's conduct tends to "taint the underlying trial," see W. T. Grant Co., supra, 531 F.2d at 678, by disturbing the balance of the presentations in one of the two ways indicated above, courts should be quite hesitant to disqualify an attorney. Given the availability of both federal and state comprehensive disciplinary machinery, see, e. g., Local Rules of the United States Court of Appeals for the Second Circuit s 46(h) (1978), there is usually no need to deal with all other kinds of ethical violations in the very litigation in which they surface. See Lefrak v. Arabian Am. Oil Co., 527 F.2d 1136, 1141 (2d Cir. 1975); Ceramco, Inc. v. Lee Pharmaceuticals, supra, 510 F.2d at 271. Cf. United States v. Pastore, 537 F.2d 675 (2d Cir. 1976).

*1247 [3] With these thoughts in mind, we turn to the ethical problems presented by the instant appeal. [FN8] The district court disqualified Mr. Sandner because a "layman's faith would be severely troubled" by the fact that "the female teachers are paying, in part, for their opponents' legal expenses." There is no claim, however, that Mr. Sandner feels any sense of loyalty to the women that would undermine his representation of the men. Nor is there evidence that his representation of the men is anything less than vigorous. There is also no claim that the men have gained an unfair advantage through any access to privileged information about the women. Were there any such problem, the women would not be asking, and the district judge would not have ordered, as an alternative to disqualification of Mr. Sandner, that NYSUT pay their attorney's fees. Thus, in no real sense can Mr. Sandner's representation of the men be said to taint the trial.

FN8. There is no dispute that the order here is appealable, but we do take note of recent controversy centering on appealability of district court orders Denying a disqualification motion. See Note, The Appealability of Orders Denying Motions for Disqualification of Counsel in the Federal Courts, 45 Chi.L.Rev. 450 (1978). Although Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 496 F.2d 800 (2d Cir. 1974) (en banc) recently established that such

orders denying disqualification are appealable in this circuit, there have been later rumbles of discontent regarding the new rule. See Allegaert v. Perot, 565 F.2d 246, 251 (2d Cir. 1977); W. T. Grant Co. v. Haines, supra, 531 F.2d at 677-78; Van Graafeiland, Lawyer's Conflict of Interest A Judge's View (Part II), N.Y.L.J., July 20, 1977, at 1, col. 2. Obviously where, as here, the motion seeking disqualification has been Granted, appellate review is appropriate.

[4][5] We agree that there is at least some possibility that Mr. Sandner's representation of the men has the appearance of impropriety, because of the large number of union members involved and the public importance of the civil rights issue at the heart of the dispute. But in any event, we think that disqualification was inappropriate. We believe that when there is no claim that the trial will be tainted, appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest cases. This is particularly true where, as in this case, the appearance of impropriety is not very clear. We note that while on one hand there is an element of unfairness to the women,[FN9] on the other it seems probable that if NYSUT were to take a position on the merits of this litigation, Mr. Sandner's representation of the men would apparently be within the protection of the "fair representation" cases discussed in Part II, Supra. This means that the question whether Mr. Sandner's conduct is unethical could be a very close one. Since disqualification entails immediate disruption of the litigation, it is better to relegate any questions about Mr. Sandner's conduct to other appropriate proceedings. In addition to the possibility of grievance proceedings and an internal union attack on the legal plan, see note 9, Supra, it may be that judicial construction of the plan, in an appropriate lawsuit, could provide some relief for the women.

FN9. The unfairness may in part be due to the nature of the plan adopted by NYSUT which leaves so much to Mr. Sandner's discretion. This suggests that the women should take whatever steps are possible within normal internal union processes. Cf. also Abood v. Detroit Board of Education, 431 U.S. 209, 237-42, 97 S.Ct.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1782, 52 L.Ed.2d 261 (1977).

We therefore reverse the order of the district court disqualifying counsel, and remand for continuation of the action.

MANSFIELD, Circuit Judge (concurring):

For the reasons ably stated by Judge Feinberg, I concur in the view that a federal court should not disqualify an attorney on ethical grounds from representing a party in a pending lawsuit in the absence of a reasonable basis for believing that his or her unprofessional conduct may affect the outcome. An "appearance of impropriety" on an attorney's part would rarely have this effect.[FN1] The attorney is the client's choice. *1248 Disqualification is wasteful and time-consuming. Only where the attorney's unprofessional conduct may affect the outcome of the case is there any necessity to nip it in the bud. Otherwise conventional disciplinary machinery should be used and, if this is inadequate, the organized bar must assume the burden of making it effective as a deterrent.

FN1. Our decision in General Motors Corporation v. City of New York, 501 F.2d 639 (2d Cir. 1974), is an example of a case where a combination of an attorney's "appearance of impropriety" plus his violation of another disciplinary rule might have affected the outcome. There we held that a lawyer who had, as an attorney for the Antitrust Division of the Department of Justice, been involved with a Government investigation of and lawsuit against General Motors alleging monopolization of the market for city buses, was barred from later representation in private practice of the City of New York in its antitrust suit for damages against General Motors based on essentially the same claims, albeit with respect to a later point in time. Although we there noted the importance of a lawyer's avoiding an appearance of impropriety as required by Canon 9, we also emphasized the additional specific prohibition of D.R.

9-101(B), not applicable here, to the effect that "A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee," 501 F.2d at 648-49. Implicit in this Disciplinary Rule is the concern that the former Government attorney might in the later private action use information with respect to the matter in issue which was gained in confidence as a public employee and was unavailable to the other side.

Regardless of the foregoing principle, however, in the present case I would reverse the district court's decision on the ground that there is no "appearance of impropriety" in the representation by an association-salaried lawyer such as Mr. Sandner of one set of dues-paying members pursuant to its legal services program in a case involving other dues-paying members with conflicting interests. Obviously if NYSUT, either through its charter, by-laws or some other authoritative official action, had prohibited its counsel from representing members in such a situation or had specified the terms and conditions under which legal services could be provided to members, those provisions would govern and the association's counsel would be obligated to conduct himself accordingly. But absent such a bar or blueprint, an organization financed with dues received from all members may properly take a position that benefits some members at the expense of others, provided it acts reasonably, in good faith and without hostility or arbitrary discrimination. Humphrey v. Moore, 375 U.S. 335, 349-50, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). If it is proper for the organization to do so, there is no impropriety in its counsel doing likewise, subject to the same conditions.

The relevant legal principle has been clearly stated by the Supreme Court with respect to the analogous question of fair union representation in Humphrey, supra:

"But we are not ready to find a breach of the collective bargaining agent's duty of fair representation in taking a good faith position contrary to that of some individuals whom it represents nor in supporting the position of one group of employees against that of another. In

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

590 F.2d 1241
(Cite as: 590 F.2d 1241)

Ford Motor Co. v. Huffman, 345 U.S. 330 (73 S.Ct. 681, 97 S.Ct. 1048), the Court found no breach of duty by the union in agreeing to an amendment of an existing collective bargaining contract, granting enhanced seniority to a particular group of employees and resulting in layoffs which otherwise would not have occurred. 'Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.' Id., at 338 (73 S.Ct. 681). Just as a union must be free to sift out wholly frivolous grievances which would only clog the grievance process, so it must be free to take a position on the not so frivolous disputes. Nor should it be neutralized when the issue is chiefly between two sets of employees. *1249 Conflict between employees represented by the same union is a recurring fact. To remove or gag the union in these cases would surely weaken the collective bargaining and grievance processes.

"As far as this record shows, the union took its position honestly, in good faith and without hostility or arbitrary discrimination. . . . By choosing to integrate seniority lists based upon length of service at either company, the union acted upon wholly relevant considerations, not upon capricious or arbitrary factors. The evidence shows no breach by the union of its duty of fair representation." In my view the same principles govern NYSUT's administration of its legal services plan.

Although NYSUT has not taken any official position with respect to the issues at stake in this case, its members have adopted a legal services plan authorizing its salaried counsel to represent such members as he determines in good faith to have claims or defenses that are job-related and meritorious. Nothing in the plan requires prior approval by NYSUT of such representation or limits the representation to legal controversies with third parties, as distinguished from representation of NYSUT or some of its members in differences with other members. The sole standard is whether in the

opinion of NYSUT's counsel the claim or defense is job-related and meritorious, regardless of the identity or membership of other parties involved in the legal controversy.

This standard strikes me as fair and reasonable. I fail to detect in it any appearance of impropriety, as long as NYSUT's counsel, in the course of representing the male HPETs, does not express or imply without authority that he speaks for NYSUT. Membership in NYSUT is entirely voluntary. A dues-paying member should recognize that situations will arise where the successful representation of one member or a group of members may benefit them at the expense of other members. Common examples are disputes over seniority rules, claims of unfair layoffs, transfers and denials of promotion. A person joining the organization and paying dues should therefore anticipate that if he or she becomes embroiled in a job-related controversy with NYSUT or another member, (1) NYSUT's counsel must make a choice and render services only to those members believed in good faith by him or her to have meritorious job-related claims or defenses, (2) NYSUT will not provide counsel to members whose claims or defenses are believed by its counsel in good faith to be frivolous or not job-related, and (3) in a dispute between members of the organization its counsel, in representing those believed to have a meritorious cause, will be financed by NYSUT through funds derived in part from dues-paying members who are adverse parties in the litigation.

NYSUT's provision of legal services to one member or group of members believed in good faith to have meritorious job-related claims against other members should not be labelled as creating an "appearance of impropriety" simply because the other members may take adverse positions believed by NYSUT's counsel to be frivolous or meritless. Nor should the organization, absent a contrary provision in its plan, be forced to represent members believed by it to be asserting such frivolous claims or defenses. Cf. Vaca v. Sipes, 386 U.S. 171, 191, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); Humphrey v. Moore, 375 U.S. 335, 349-50, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). None of this is intended to imply that we, as distinguished from NYSUT or its counsel, have any views regarding the merits of the claims of the male and female HPETs respectively.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

590 F.2d 1241
(Cite as: 590 F.2d 1241)

It could be argued that the NYSUT legal services plan vests its counsel with too wide a discretion to determine what members' claims are meritorious or job- related in an intra-organizational dispute, or that the plan poses too great a risk of erroneous, invidious, fraudulent or discriminatory decisions by its counsel in such matters. If so, the remedy rests in the hands of NYSUT's *1250 members who have the power to change or modify its legal services plan. In addition, of course, they would be entitled to seek relief from the court upon a showing that NYSUT's counsel had abused his powers or acted in bad faith or for reasons unconnected with the merits of the cause which he chose to advance.

In the recent decision of Jacobs v. Board of Educ., East Meadow Union Free School District, App.Div., 409 N.Y.S.2d 234 (2d Dept. 1978), which was handed down since the argument of this appeal, the Appellate Division, Second Department, of the New York Supreme Court reversed a lower court decision that had been relied upon by appellees and decided that there was no impropriety in representation by NYSUT's counsel of one of its members in a so-called "one-on- one" dispute with another member with respect to seniority, even though the organization had not taken any more of an "official" position with respect to the merits of the dispute than has NYSUT in the present case. Assuming it is proper for an organization's counsel to represent one member against another in a "one-on-one" seniority dispute, despite the absence of any organizational position with respect to the issue in dispute, I find no rational basis for distinguishing Jacobs from the present case.

Applying these relevant legal principles here, it was not improper for NYSUT's counsel to provide legal representation to the male HPETs whose job-related claim was reasonably believed by him to be meritorious. I would therefore hold not only that an "appearance of impropriety" is an insufficient ground, by itself, to justify a court's disqualification of an attorney during the prosecution of a case absent a reasonable basis for believing that such an appearance may affect the outcome, but also that in any event there was no such "appearance of impropriety" on the facts of this case.

590 F.2d 1241

Briefs and Other Related Documents (Back to top)

• 1978 WL 207687 (Appellate Brief) Appellants' Reply Brief (Jun. 30, 1978)

• 1978 WL 207686 (Appellate Brief) Brief of Appellees Cohen, Crawford and Silversmith (Jun. 14, 1978)

• 1978 WL 207685 (Appellate Brief) Appellants' Brief (May. 11, 1978)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

361 S.E.2d 753
**(Cite as: 87 N.C.App. 554, 361 S.E.2d 753)**

Page 1

c

Court of Appeals of North Carolina.

STATE of North Carolina
v.
Randy Scott YELTON.
STATE of North Carolina
v.
Phillip H. YELTON.

**No. 8727SC362.**

Nov. 17, 1987.

Father and son who were charged with narcotics-related offenses retained same attorney to represent them. The Superior Court, Cleveland County, Hollis M. Owens, Jr., J., ordered attorney to represent only one defendant. On writ of certiorari, the Court of Appeals, Eagles, J., held that: (1) father and son voluntarily, knowingly and intelligently waived right to appeal, if convicted, on grounds of ineffective assistance of counsel based upon attorney's potential conflict of interest, and (2) potential conflict, in absence of other evidence, did not require that attorney represent only one defendant.

Vacated and remanded.

West Headnotes

**[1] Criminal Law ⬅️641.5(5)**
110k641.5(5) Most Cited Cases

Trial court must play vital role in deciding outcome of constitutional and ethical questions arising from issue of whether attorney can properly represent codefendants; consequently, state may, but need not offer evidence in pretrial conflict of interest hearing and through course of hearing, trial court must determine whether attorney who jointly represents codefendants must be disqualified from representing either of them. U.S.C.A. Const.Amend. 6.

**[2] Criminal Law ⬅️641.5(5)**
110k641.5(5) Most Cited Cases

Once motion by state or defense, or court on its own motion, raises possible conflict of interest in dual

representation situation, trial court must conduct full hearing; inquiry may go further than presentation of facts by parties and may include in camera proceeding or discussions between trial judge and defendant.

**[3] Criminal Law ⬅️641.5(3)**
110k641.5(3) Most Cited Cases

When actual conflict of interest exists between two defendants represented by same attorney, attorney must be disqualified from representing one, if not both defendants.

**[4] Criminal Law ⬅️641.5(5)**
110k641.5(5) Most Cited Cases

**[4] Criminal Law ⬅️641.5(7)**
110k641.5(7) Most Cited Cases

In order for attorney to represent two codefendants, there must be evidence that defendants consented to joint representation after full disclosure of advantages and disadvantages of joint representation and further, defendants must be made aware that their insistence upon joint representation may constitute waiver of their right to argue on appeal that they were denied effective assistance of counsel due to conflict of interest because of joint representation. Rules of Prof.Conduct, Rule 5.1(B); U.S.C.A. Const.Amend. 6.

**[5] Criminal Law ⬅️641.5(7)**
110k641.5(7) Most Cited Cases

Father and son who were indicted on narcotics-related offenses voluntarily, knowingly and intelligently waived their right to appeal, if convicted, on ground of ineffective assistance of counsel based upon attorney's potential conflict of interest in representing both defendants; court's questioning apprised both defendants of potential conflict of interest inherent in having one attorney represent them both, each defendant continued to insist that attorney represent him, and given relationship between defendants, and their unequivocal testimony at hearing, it appeared unlikely that either would testify against the other.

**[6] Criminal Law ⬅️641.10(1)**
110k641.10(1) Most Cited Cases

Accused's right to counsel includes right to select

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

and retain attorney of his choice; however, indigent defendant does not have same right to choose his own counsel, but rather must accept experienced and competent attorney appointed for him by court. U.S.C.A. Const.Amend. 6.

[7] Criminal Law ⚖==641.5(.5)
110k641.5(.5) Most Cited Cases
(Formerly 110k641.5)

In order for defendants' attorney to be disqualified from representing either of two codefendants, State must show significant prejudice to one of defendants, in absence of showing that attorney attempted to disrupt orderly processes of justice. U.S.C.A. Const.Amend. 6.

[8] Criminal Law ⚖==641.5(3)
110k641.5(3) Most Cited Cases

In joint representation cases, only where there is actual conflict of interest which denies codefendants effective assistance of counsel does problem arise; potential conflict of interest, as distinguished from actual conflict of interest, is not sufficient to warrant State's interference with constitutionally guaranteed right of criminal defendant to retain and be represented by counsel of his choice. U.S.C.A. Const.Amend. 6.

[9] Criminal Law ⚖==641.5(3)
110k641.5(3) Most Cited Cases

Potential conflict of interest in representation of two codefendants which was not shown to substantially prejudice either defendant's interests was not sufficient to justify interference with defendant's right to representation by retained counsel of his choice and thus, attorney could maintain representation of both defendants. U.S.C.A. Const.Amend. 6.

**754 *554 The petitioners in this action, Phillip H. Yelton and Randy Scott Yelton, are father and son, respectively. During its 5 May 1986 session, the Cleveland County grand jury returned multiple true bills of indictment against each of them charging narcotics-related offenses. Among the charges were two charges of conspiracy to traffic in cocaine and one charge of conspiracy to sell and deliver cocaine naming the two defendants as co-conspirators.

*555 Phillip Yelton and his son Randy Scott

Yelton retained William E. Lamb, Jr. to represent them. Mr. Lamb filed numerous pre-trial motions and requests on behalf of each of the petitioners.

On 17 October 1986 the State filed a motion requesting the trial court to determine whether Mr. Lamb's representation of both petitioners was proper under the circumstances. After a hearing on 21 November 1986, at which both defendants testified, the trial court ordered Mr. Lamb to represent only one defendant and to notify the District Attorney's office which of the defendants he would represent. On 5 December 1986, Mr. Lamb filed writs of supersedeas and certiorari with the Court of Appeals. The writ of supersedeas was allowed on 5 December 1986. On 12 January 1987 the Court of Appeals allowed petitioners' writ of certiorari and stayed further proceedings in the trial court pending disposition of the writ of certiorari.

**755 Atty. Gen. Thornburg by Asst. Atty. Gen. Francis W. Crawley, Raleigh, for State.

William E. Lamb, Jr., Lamb Law Offices, Shelby, for defendant-petitioners.

EAGLES, Judge.

Petitioners contend the trial court erred in two respects: failing to dismiss the State's motion when the State presented no evidence and issuing an order directing petitioners' retained counsel to represent only one defendant. Though we disagree with appellants' first contention, we agree that the trial court erred by ordering the petitioners' counsel to represent but one defendant. Accordingly, we reverse.

I

Petitioners first assign as error the trial court's denial of their motion to dismiss the State's motion. Petitioners argue that since the State brought the motion before the court, the burden was upon the State to show that petitioners must have separate counsel. No evidence having been offered by the State, petitioners argue that the State has not met its burden. We disagree.

[1] We hold that the trial court must play the vital role in deciding the outcome of the constitutional

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

361 S.E.2d 753
(Cite as: 87 N.C.App. 554, 361 S.E.2d 753)

and ethical questions arising from this issue. Consequently, the State may, but need **\*556** not, offer evidence in pre-trial conflict of interest hearings. In effect, the State merely brings the conflict issue to the court's attention. Through the course of the hearing the trial court will determine whether an attorney who jointly represents co-defendants must be disqualified from representing either of them.

The procedural posture of this case is unusual. Rarely before trial is there any inquiry into potential problems associated with multiple representation of defendants by a single attorney. The issue of multiple representation customarily arises in the context of post-trial claims of ineffective assistance of counsel either on appeal or in post-conviction proceedings by one of the defendants. Those cases, though not dispositive here, are helpful in determining the questions before us.

*Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), addressed the ineffective assistance of counsel issue. There a court-appointed attorney represented three individual defendants charged with robbery and rape. In two separate pre-trial motions, the defense attorney stated that if he continued to represent all three defendants, there was the possibility of a conflict of interest in each of the cases and moved the court to appoint separate counsel. The trial court conducted a hearing on the first motion, but the defense attorney was not allowed to present evidence to show the alleged conflict of interest. The Supreme Court ruled that the steps taken by the trial court were inadequate and deprived the defendants of the effective assistance of counsel. In *Cuyler v. Sullivan,* 446 U.S. 335, 346, 100 S.Ct. 1708, 1717, 64 L.Ed.2d 333, 345 (1980), the Supreme Court noted that "*Holloway* requires state trial courts to investigate timely objections to multiple representation."

In *State v. Arsenault,* 46 N.C.App. 7, 14, 264 S.E.2d 592, 596 (1980), our court recognized "the need for the trial judge to inquire prior to trial about possible conflict of interests [sic] arising from joint representation of codefendants by members of the same law firm or by single joint counsel." *Arsenault,* like *Holloway,* considered the issue of ineffective assistance of counsel upon post-conviction review. Though both *Holloway* and *Arsenault* involved *defendants'* objections to

joint representation by their attorney, there is no reason why the *State* may not also raise the question before trial. *Compare,* North Carolina Rules of **\*557** Professional Conduct, Rule 5.1 comment (1985) (opposing counsel may raise objection but not as technique for harassment).

[2] Once a motion by the State or the defense, or the court on its own motion, raises a possible conflict of interest in a dual representation situation, the trial court must conduct a hearing. *Cuyler,* 446 U.S. at 346, 100 S.Ct. at 1717. *See also* **\*\*756** *United States v. Duklewski,* 567 F.2d 255 (4th Cir.1977) (defendant must know details of possible conflict of interest before counsel may be disqualified).

[3] When an actual conflict of interest exists between two defendants represented by the same attorney, the attorney must be disqualified from representing one, if not both, defendants. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); North Carolina Rules of Professional Conduct, Rule 5.1 (1985). Therefore, the court must conduct a full and searching inquiry to determine whether an actual conflict of interest exists. This inquiry may go further than the presentation of facts by the parties and may include *in camera* proceedings or discussions between the trial judge and defendants. Foremost in the court's inquiry must be the preservation of the accused's constitutional rights. The hearing by the trial court must ensure that the defendants are aware of these rights and that any waiver is a knowing, intelligent and voluntary waiver.

[4] First, there must be evidence on the issue of defendants' consent to joint representation. This consent must have been based upon a full disclosure of the advantages and disadvantages of joint representation. North Carolina Rules of Professional Conduct, Rule 5.1(B) (1985). Here, both defendants testified that Mr. Lamb had discussed the potential conflict of interest with each of them. The conflict of interest here would arise, primarily, where one defendant's interests would be served by his giving testimony against the other. Both defendants denied this was a problem because each had decided he would not testify against the other.

Defendants must be made aware that their insistence upon joint representation may constitute a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

waiver of their right to argue on appeal that they were denied effective assistance of counsel due to a conflict of interest because of joint representation. *United States v. Garcia,* 517 F.2d 272 (5th Cir.1975); *see United States v. Atkinson,* 565 F.2d 1283, *cert. denied,* 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (4th Cir.1977); *558State v. Johnson,* 47 N.C.App. 297, 267 S.E.2d 45, *disc. rev. denied,* 301 N.C. 101, 273 S.E.2d 305 (1980). "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege," *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938), and any waivers must be "knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747, 756 (1970).

In *Garcia,* the United States Court of Appeals discussed the waiver issue. Though that decision is not controlling, it is instructive. There, nine members of the Houston Police Department had been indicted on various federal charges. Each of the defendants retained the attorney of his choice. Two of the defendants hired a single attorney to represent them. The other seven defendants hired two different attorneys to represent all seven of them. The government filed a motion asking the district court to consider conflicts of interest and possible disqualifications of the attorneys. The district court ordered all nine defendants to retain new counsel and disqualified the three attorneys from the case. On appeal, the Fifth Circuit Court reversed and remanded. The Court held that the effective assistance of counsel, like any other constitutional right, could be waived but only so long as the waiver was voluntary, knowing, and intelligent. *Garcia,* 517 F.2d at 278.

The *Garcia* Court ordered that inquiry procedures "akin to ... Fed.R.Crim.Proc. 11" be followed by the trial court:
> As in [F.R.Crim.Pro.] 11 procedures, the district court should address each defendant personally and forthrightly advise him of the potential dangers of representation by counsel with a conflict of interest. The defendant must be at liberty to question the district court as to the nature and consequences of his legal representation. Most significantly, the court should seek to elicit a narrative response from each defendant that he has been advised of his

right to effective representation, that he understands the details of his attorney's possible conflict **757 of interest and the potential perils of such a conflict, that he has discussed the matter with his attorney or if he wishes with outside counsel, and that he voluntarily waives his Sixth Amendment protections. [Citations omitted.]

*Id.*

[5] *559 In the instant case, defense counsel's examination and, particularly, the vigorous cross-examination of both defendants at the hearing below demonstrates substantial compliance with the inquiry called for in *Garcia.* The questioning here apprised both defendants of the potential conflict of interest inherent in having one lawyer represent them both. The State, as well as the defense, inquired into the possibility and probability of one defendant testifying against the other. Given the relationship between these two defendants (father and son) and their unequivocal testimony at the hearing, it appears unlikely that either will testify against the other. Additionally, throughout their testimony each defendant continued to insist that Mr. Lamb represent him. The record before us clearly demonstrates that Phillip H. Yelton and Randy Scott Yelton have voluntarily, knowingly, and intelligently waived their right to appeal, if convicted, on grounds of ineffective assistance of counsel based upon Mr. Lamb's potential conflict of interest.

II

Petitioners next argue that the court's order directing Mr. Lamb to represent only one defendant deprived petitioners of the right to counsel of their choice. We agree and reverse the order of the trial court.

[6] The North Carolina and United States Constitutions guarantee each individual the right to counsel in criminal cases. *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *State v. Speller,* 230 N.C. 345, 53 S.E.2d 294 (1949). The accused's right to counsel includes the right to select and retain an attorney of his choice. *State v. Morris,* 275 N.C. 50, 165 S.E.2d 245 (1969). On the other hand, an indigent defendant does not have the same right to choose his own counsel, but rather must accept an experienced and competent attorney appointed for him by the court. *State v. Robinson,*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

290 N.C. 56, 224 S.E.2d 174 (1976). Here Mr. Lamb is retained by both defendants.

In *State v. McFadden,* 292 N.C. 609, 234 S.E.2d 742 (1977), the court balanced the defendant's right to the counsel of his choice against the denial of a continuance so that defendant's chosen counsel could try the case. The defendant had retained Mr. Powell to represent him on a felonious sale and delivery of cocaine charge. Mr. Powell received one continuance before the case *560 came for trial. The week before the case was to be heard, the district attorney refused to agree to another continuance based on Mr. Powell having another case pending in federal court. On the day of trial, Mr. Powell's associate appeared to move for another continuance. The associate knew nothing about McFadden's case; only Mr. Powell knew the case. The trial judge denied the request and required trial to begin, despite the defendant's protestations that he wanted Mr. Powell, his retained counsel, to represent him.

On appeal, the Supreme Court reversed the trial court holding that the trial court impermissibly deprived the defendant of a reasonable time to obtain the counsel of his choice. In reaching its decision the Court quoted with approval:

The state should keep to a necessary minimum its interference with the individual's desire to defend himself in whatever manner he deems best, using any legitimate means within his resources--and that desire can constitutionally be forced to yield only when it will result in significant prejudice to the defendant or in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case.

*Id.,* 292 N.C. at 613-614, 234 S.E.2d at 746 (quoting *People v. Crovedi,* 417 P.2d 868, 65 Cal 2d 199, 53 Cal Rptr. 284 (1966)).

[7] The State does not contend, nor does the record reflect, that the Yeltons hired Mr. Lamb intending to disrupt the orderly processes of justice. Nothing in **758 Mr. Lamb's pre-trial conduct was disruptive or suggests that he was attempting to be disruptive. Having failed to show a disruption of the judicial processes, in order to prevail the State must show a significant prejudice to one of the defendants.

In considering what constitutes "significant

prejudice" here, we note that the United States Supreme Court has held that having a single attorney represent two or more co-defendants was not a *per se* violation of the Sixth Amendment right to the effective assistance of counsel. *Holloway,* 435 U.S. at 482, 98 S.Ct. at 1177. Quoting from Justice Frankfurter's dissent in *Glasser,* the Supreme Court in *Holloway* recognized that in some instances there might be advantages in joint representation: "Joint representation is a means *561 of insuring against reciprocal recrimination. A common defense often gives strength against a common attack." *Id.* at 482-483, 98 S.Ct. at 1178 (quoting *Glasser,* 315 U.S. at 92, 62 S.Ct. at 475 (Frankfurter, J., dissenting)).

Recently, the Supreme Court reaffirmed this position and, further, stated that prejudice to a defendant could not be presumed from the mere fact of joint representation. *Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). The Court stated that prejudice would be presumed only upon a demonstration "that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' " *Id.,* at ----, 107 S.Ct. at 3128, 97 L.Ed.2d at 650 (quoting *Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984) (citation omitted)).

In *United States v. Atkinson,* 565 F.2d 1283 (4th Cir.1977), the court indicated that where counsel was retained in joint representation situations, the defendants "more than anyone, including the court, were in a position to know what facts might be developed at trial. Apparently they concluded that such representation was advantageous...." *Id.* at 1284.

In *Cuyler* the United States Supreme Court held that a state prisoner was not entitled to a writ of habeas corpus merely by showing his retained counsel represented *potentially* conflicting interests. There, the Court said the *possibility* of a conflict of interest was insufficient to reverse a criminal conviction. To prevail, the defendant must establish an *actual* conflict of interest. *Cuyler,* 446 U.S. at 350, 100 S.Ct. at 1719.

[8] Accordingly, we conclude that joint representation, nothing else appearing, is not always prejudicial. In joint representation cases, only where there is an actual conflict of interest which

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

361 S.E.2d 753
(Cite as: 87 N.C.App. 554, 361 S.E.2d 753)

denies the defendants the effective assistance of counsel does a problem arise. A *potential* conflict of interest, as distinguished from an *actual* conflict of interest, is not sufficient to warrant the State's interference with the constitutionally guaranteed right of a criminal defendant to retain and be represented by the counsel of his choice.

[9] In the instant case the State has shown no actual conflict of interest. Indeed, the trial court's conclusion was that there was "a clear potential conflict of interest between the best interest of the *562 [d]efendants [sic]." The findings of fact and the evidence support this conclusion of law. We conclude that a potential conflict of interest which is not shown to substantially prejudice defendant's interests is not sufficient to justify interference with defendant's right to representation by the retained counsel of his choice. Accordingly, we vacate the trial court's order directing Mr. Lamb represent only one defendant and remand the case to the trial court.

We note that under the North Carolina Rules of Professional Conduct, defense counsel has an ongoing professional and ethical obligation to avoid representing conflicting interests. North Carolina Rules of Professional Conduct, Rule 5.1 (1985). The *Cuyler* court recognized that the attorney is in the "best position professionally and ethically" to determine when and where conflicts may arise. *Cuyler,* 446 U.S. at 347, 100 S.Ct. at 1717. The Rules of Professional Conduct already allocate to the **759 attorney the obligation of assuring his compliance with the rules.

Vacated and remanded.

MARTIN and ORR, JJ., concur.

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

232 F.2d 199
**(Cite as: 232 F.2d 199)**

Page 1

**H**

United States Court of Appeals Second Circuit.

FISHER STUDIO, Inc. and Robert V. Fisher,
Plaintiffs-Appellants, and David H.
Isacson and Malkan & Isacson, Appellants,
v.
LOEW'S INCORPORATED et al.,
Defendants-Appellees.

**No. 233, Docket 23908.**

Argued Feb. 15, 1956.
Decided April 2, 1956.

Anti-trust action in which the United States District Court for the Eastern District of New York, Matthew T. Abruzzo, J., entered order disqualifying plaintiffs' attorneys from acting for plaintiffs in the action and thereafter entered order disqualifying them in other actions, and plaintiffs and their attorneys appealed. The Court of Appeals, Clark, Chief Judge, held that evidence as to similarity of interest, exchange of information, and consort of action of all defendants was sufficient to disqualify plaintiffs' attorneys from acting as such attorneys in such action and in other actions as to nine defendants who were former clients of law firm with which one of plaintiffs' attorneys had been associated, but such evidence was not sufficient to establish a disqualification as to the other six defendants.

Orders modified, and as modified, affirmed.

West Headnotes

**[1] Federal Courts ⬿714**
170Bk714 Most Cited Cases
(Formerly 106k405(16.10))

Where, in anti-trust action, certain files were produced only upon demand of plaintiffs and their attorneys over objection of defendants that the files were privileged communications relevant to the main action, and defendants did not rely upon the files, and plaintiffs and their attorneys expressly agreed to waive all evidentiary objections not raised in their brief before the master, plaintiffs and their attorneys would not be heard to argue that denial of opportunity to inspect such files constituted a

deprivation of due process, in view of fact that such objection was not contemplated in their brief.

**[2] Monopolies ⬿25(6.1)**
265k25(6.1) Most Cited Cases
(Formerly 265k25(6), 265k25)

Where most that plaintiffs and their attorneys could hope to achieve, in antitrust proceeding, if permitted to inspect files of certain legal firm would be to lessen cumulative effect of the evidence, not provide that affirmative exoneration which was vital for their salvation, master exercised wise discretion in denial of opportunity to inspect, and trial court's affirmation thereof was proper.

**[3] Federal Civil Procedure ⬿2353**
170Ak2353 Most Cited Cases

Where it was quite doubtful whether "newly discovered evidence" could have changed result if new trial had been granted, refusal to grant new trial on basis of dubious evidence presented was not an abuse of discretion.

**[4] Federal Courts ⬿906**
170Bk906 Most Cited Cases
(Formerly 106k406.6(6))

Where, in anti-trust proceeding, fate of plaintiffs and their attorneys was clear after thorough trial before master, incident involving conduct of judge, however regrettable, would not lead to reversal of the long and well proven case which had a salutary conclusion.

**[5] Federal Courts ⬿686**
170Bk686 Most Cited Cases
(Formerly 106k405(15))

Where orders disqualifying plaintiffs' attorneys from acting for plaintiffs were collateral to main anti-trust action, and the final order but interpreted stipulation of parties to deduce from it the extent of future disqualification, such order was not beyond court's jurisdiction, even though previous appeal had been taken when it was entered.

**[6] Attorney and Client ⬿21.5(1)**
45k21.5(1) Most Cited Cases
(Formerly 45k21)

In anti-trust action, evidence as to similarity of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

232 F.2d 199
(Cite as: 232 F.2d 199)

interest, exchange of information, and consort of action of all defendants was sufficient to disqualify plaintiffs' attorneys from acting as such attorneys in such action and other actions as to nine defendants who were former clients of law firm with which one of plaintiffs' attorneys had been associated, but such evidence was not sufficient to establish a disqualification as to the other six defendants.

[7] Judgment ☞585(5)
228k585(5) Most Cited Cases

Where, in anti-trust action, court's holding that plaintiffs' attorneys were not to be disqualified from appearing for plaintiffs as against six of the fifteen defendants was based on lack of evidence, such holding would not be res judicata with respect to action against the six defendants but, if further acts justifying disqualification as to them appeared, District Court would be at liberty to take such action as it might deem appropriate.

[8] Attorney and Client ☞20.1
45k20.1 Most Cited Cases
(Formerly 45k20)

Lawyers ought not to be subjected to recurrent harassment by way of disqualification proceedings, but power of court to control its officers is continuous, and remedy of disqualification is an instrument to that end.

[9] Attorney and Client ☞19
45k19 Most Cited Cases
(Formerly 45k32)

In anti-trust action in which plaintiffs' attorneys had been disqualified from acting for plaintiffs as against those defendants who had been former clients of law firm with which one of plaintiffs' attorneys had been associated, such attorney's alleged solicitation of the action would not form a separate ground for his disqualification and thus justify disqualification as to the non-client defendants.
*200 Bruno Schachner, New York City (David H. Isacson and Arnold G. Malkan, New York City, on the brief), for plaintiffs-appellants.

Bruce Bromley, New York City (Louis Phillips, John Logan O'Donnell, and Leo P. Arnaboldi, Jr., New York City, on the brief), for defendants-appellees.

Before CLARK, Chief Judge, and FRANK and HINCKS, Circuit Judges.

CLARK, Chief Judge.

This is another of the several appeals before us recently involving the issue of attorneys' disqualification for previous representation of the defendants in anti-trust cases. The background of this case is set forth in Laskey Bros. of West Virginia v. Warner Bros. Pictures, 2 Cir., 224 F.2d 824, certiorari denied 350 U.S. 932, 76 S.Ct. 300, which actually concerns a later disqualification of attorneys dependent on the facts here brought out below. See also Consolidated Theatres v. Warner Bros. Circuit Management Corp., 2 Cir., 216 F.2d 920, establishing the controlling principles of law.

This particular appeal comes from orders made in an antitrust action brought by certain exhibitors of 16 mm. motion *201 picture films against fifteen film producers and distributors alleging arbitrary restriction upon the distribution and exhibition of 16 mm. films and the establishment and maintenance of a price-fixing system against the plaintiffs. Plaintiffs, their attorney David H. Isacson, and the dissolved law firm of Malkan & Isacson are appealing from an order of the district court disqualifying Isacson and his firm from representing the plaintiffs. Upon defendants' original motion for disqualification the court referred the matter to Special Master Harold F. McNiece, who filed a report of over 200 pages concluding that both Isacson and the firm were disqualified. Judge Abruzzo adopted and confirmed the report and ordered the recommended disqualification. Subsequently he denied a motion for new trial on the issue of disqualification. The appeal is from both these orders. Later the judge entered a third order interpreting a prior stipulation of the parties, by which interpretation the disqualification was made applicable to all 35 mm. and 16 mm. antitrust cases and underreporting cases to which defendants were party. This, too, is the subject of appeal, with a request for consolidation of the appeals.

The facts upon which the disqualification was based were exhaustively developed in the procedings before the Special Master and are set forth in convincing detail in his thorough report.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

232 F.2d 199
(Cite as: 232 F.2d 199)

We shall make only a summary reference to them here.

Isacson was employed by the law firm of Sargoy & Stein between November, 1946, and March, 1951. Sargoy & Stein was organized in 1946, and during the period of Isacson's employment was the legal representative of eight of the present defendants or their corporate predecessors, if any, in matters closely related to this suit. It also rendered services to and received compensation from a ninth defendant in respect to treble-damage antitrust claims. Sargoy & Stein rendered services to four other defendants, which were either subsidiaries or film distributors of its clients, but received no compensation from them. As to the other two defendants, which also acted as film distributors for certain of Sargoy & Stein's clients, the evidence is unclear, but the law firm 'may' have dealt with matters involving these defendants.

Sargoy & Stein first employed Isacson as an auditing clerk, but from the early part of 1947 he assumed the duties of a lawyer and his name appeared on the firm's letterhead. As a member of the firm's staff, he was in a position to acquire knowledge of the manner in which the companies did business in the 16 mm., as well as the 35 mm., field. This included knowledge as to which companies produced 16 mm. prints; the use to which they put them; the manner of licensing of 16 mm. pictures for exhibition; the limitations, if any, that were imposed on the distribution; the contractual provisions between the companies and their licensees, limiting the use of the pictures; and the terms of the licenses. All this information was accessible to him from the files of Sargoy & Stein.

During Isacson's employment, the firm brought or participated in 464 suits on behalf of distributors against exhibitors for percentage frauds or underreporting or other actions for recovery of rentals. Of these, at least 233 involved antitrust defenses, counterclaims, or countersuits by exhibitors. Of these 233 cases, Isacson, then on behalf of distributors, initialed or marked memoranda or correspondence in every one, wrote letters or memoranda in 170 of the cases, and participated in taking depositions in 72. There was convincing evidence that Isacson worked on and was well acquainted with the antitrust aspects of a number of cases and his evasive testimony at the Master's hearing did not serve to rebut this

conclusion. Although his work primarily involved 35 mm. matters, he had access to the 16 mm. files and 16 mm. matters were on occasion discussed with him. In any event, 35 mm. and 16 mm. antitrust problems are so related *202 that confidential information gained in one area would be of value in the other.

Fisher, one of the plaintiffs in this action, first came into contact with Sargoy & Stein in 1946 when he visited their office. Isacson met Fisher through a mutual acquaintance in that office. Isacson left Sargoy & Stein in March, 1951; and the complaint in this action was filed in September, 1952. There was testimony that in August, 1952, Isacson telephoned an attorney employed by Sargoy & Stein to inquire if he knew the names of persons in the 16 mm. film field who might have justifiable complaints and asked specifically about Fisher. And there were other circumstances from which solicitation of this suit by Isacson might have been strongly inferred.

On the basis of all the evidence both the Special Master and Judge Abruzzo found that Isacson had violated Canons 6 and 37 of the Canons of Professional Ethics of the American Bar Association [FN1] by utilizing the private and confidential information obtained while an employee of Sargoy & Stein as a basis for a lawsuit against the clients of that firm. The Master further found that he had violated Canons 27 and 28 [FN2] by soliciting the lawsuit. Judge Abruzzo entered an order of disqualification as to all defendants on the basis of improper use of confidential information alone, but the Special Master relied on this ground as to the nine clients of Sargoy & Stein only, and upon solicitation as to the other defendants.

FN1. Of Canon 6, 'Adverse Influences and Conflicting Interests,' the most pertinent part here is the last paragraph, viz.:
'The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed.'
The first two sentences of Canon 37, 'Confidences of a Client,' are as follows: 'It

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

is the duty of a lawyer to preserve his client's confidences. This duty outlasts the lawyer's employment, and extends as well to his employees; and neither of them should accept employment which involves or may involve the disclosure or use of these confidences, either for the private advantage of the lawyer or his employees or to the disadvantage of the client, without his knowledge and consent, and even though there are other available sources of such information.'

FN2. Canon 27 holds it unprofessional to solicit professional employment through advertising, touters, or personal communications, while Canon 28 so treats the stirring up of litigation, directly or through agents.

There was ample evidence to support findings of violation of Canons 6 and 37. It is apparent that Isacson had access to significant quantities of confidential information of great value in the prosecution of this case. In fact the inference is overwhelming that Isacson's primary value to the plaintiffs here lies in his possession of this information. Isacson left Sargoy & Stein early in March, 1951, and did not enter into partnership with Malkan until July, 1952. During that time he unsuccessfully tried to obtain legal employment, operated a garage, and even made an effort to rejoin Sargoy & Stein. His lack of legal success during this interim period when viewed in connection with the formation of the partnership and the subsequent institution of this lawsuit lend impressive weight to the conclusion that the confidential information was the principal reason for his retainer by Fisher.

Similarly, if here pertinent, the evidence of solicitation is clear cut and convincing, and in many cases is interwoven with the evidence of improper use of confidential information. For example, the Special Master found that Isacson sent a letter to one Coy, a potential client who was then engaged in litigation against certain motion picture companies represented by Sargoy & Stein, stating 'that Mr. Isacson here was formerly with Sargoy & Stein and is familiar with the procedures and tactics and settlements.' The record is replete with other evidence of solicitation and advertisement. As

pithily put by *203 the Special Master, 'All that was missing from Mr. Isacson's campaign was a neon sign.'

[1][2] Appellants' principal argument is directed to an alleged deprivation of due process on the ground that they were denied the opportunity to inspect certain 16 mm. files of Sargoy & Stein which were submitted to the Special Master and inspected by him. It appears, however, that the files were produced only upon the demand of appellants and over the objection of appellees that they were privileged communications relevant to the main action. Appellees therefore did not rely upon the files, which thus were not presented to fill gaps in their proof. It seems from the colloquy set forth in appellants' appendix that they did not then object to the Master's refusal to allow them to inspect the files concerning the 16 mm. films; in any event, at the end of the hearing they expressly agreed to waive all evidentiary objections not raised in their brief before the Master. They now refer to asserted objections in their before the Master and in their later formal document entitled 'Objections to Confirmation of Master's Report.' The former is not before us, but the latter is and shows by the very general nature of the objections cited that the then trial counsel did not have particularly in mind the point now stressed. In fact it was not urged until almost two months after the judge had handed down his opinion confirming the Master's Report. Hence appellants' waiver was complete, and they should not be heard to raise the point here. See State ex rel. McKittrick v. Wallach, 353 Mo. 312, 182 S.W.2d 313, 155 A.L.R. 1. But on the equities there is little to be said for such a violation of privacy as would be involved in thus opening these private files to a public and rival gaze; even if appellants' rather exaggerated emphasis upon a supposed separation of 35 mm. and 16 mm. business be somewhat accepted, the most that appellants could hope to achieve would be to lessen the cumulative effect of the evidence, but not to provide that affirmative exoneration which is vital for their salvation. We think that the Master exercised a wise discretion in his ruling, and that the court acted properly in affirming it.

[3][4] Appellants further object to the denial of their motion for a new trial based primarily upon grounds of newly discovered evidence. This evidence consisted in essential part of the testimony of one Siegel-- attempting to modify his testimony

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

before the Master-- and one Hilton, who had not testified previously. The court granted a hearing at which an attempt was made to show that the information in the 16 mm. files had not in fact been available to Isacson while he was in the employ of Sargoy & Stein. It is quite doubtful that this 'newly discovered evidence' could have changed the result if a new trial had been granted. See Irvin v. Buick Motor Co., 8 Cir., 88 F.2d 947, 951, certiorari denied 301 U.S. 702, 57 S.Ct. 932, 81 L.Ed. 1357; Glade v. Allied Electric Products, 7 Cir., 135 F.2d 390. In any event there was not an abuse of discretion in refusing to grant a new trial on the basis of the dubious evidence presented by appellants. Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 53 S.Ct. 252, 77 L.Ed. 439; Campbell v. American Foreign S.S. Corp., 2 Cir., 116 F.2d 926, 928, certiorari denied 313 U.S. 573, 61 S.Ct. 959, 85 L.Ed. 1530; Gillette Safety Razor Co. v. Triangle Mechanical Laboratories Corp., 2 Cir., 87 F.2d 699, 702. Appellants object to the conduct of this hearing by the judge, and we are constrained to say that he acted far from judicially in his interruptions of the witnesses and counsel and his attitude showing personal pique and offense at the challenge to his prior ruling. He should not have taken the trial into his own hands, see United States v. Steiner Plastics Mfg. Co., 2 Cir., 231 F.2d 149; indeed, it would have been preferable that no formal hearing he held rather than one of partial character. But appellants' fate was clear after the thorough trial before ***204** the Master; and however regrettable this incident, it should not lead to a reversal of a long and well-proven case with a salutary conclusion.

[5] Appellants also object to the judge's further order of March 22, 1955, interpreting a prior stipulation of the parties and disqualifying Isacson as to 35 mm., as well as 16 mm., antitrust actions. The appeal from this order was taken by Malkan and Ellner and the law firm of Malkan & Ellner-- a later partnership than the one here most directly involved. But, particularly since Malkan is an active participant in both appeals, we see no reason to dismiss this appeal for want of prosecution, as defendants urge. Plaintiffs seek to hold the order beyond the jurisdiction of the court, since the previous appeal had already been taken when it was entered. Were this a review of a seemingly final judgment in the main antitrust action, the point would doubtless be well taken; but since these orders of disqualification are collateral to the main case and this final order but interprets the stipulation of the parties to deduce from it the extent of future disqualification, we think it also appropriately treated as a separate and collateral proceeding. On the merits it seems within the terms of the stipulation. Compare Laskey Bros. of West Virginia v. Warner Bros. Pictures, supra, 2 Cir., 224 F.2d 824, certiorari denied 350 U.S. 932, 76 S.Ct. 300.

[6][7][8] Finally, we reach the question whether the disqualification should properly run in favor of all fifteen defendants in the present action or only those who were clients of Sargoy & Stein when Isacson was associated with that firm. While the district court found sufficient similarity of interest, exchange of information, and consort of action among all the defendants to justify a disqualification as to all, we think the evidence is not clear enough to support such a sweeping ban except as to those nine defendants who were former clients of the law firm. Consolidated Theatres v. Warner Bros. Circuit Management Corp., supra, 2 Cir., 216 F.2d 920, 928. We do not however regard our holding here as res judicata with respect to suits against the other six defendants. While lawyers ought not to be subjected to recurrent harassment by way of disqualification proceedings, the power of the court to control its officers is continuous and the remedy of disqualification is an instrument to that end. Our holding is based on lack of evidence, not necessarily on the absence of any case; if further facts justifying disqualification appear, the district court is at liberty to take such action as it deems appropriate.

[9] We do not think that the solicitation shown here may form a separate ground for disqualification and thus justify such action as to the six nonclient defendants. Solicitation may well merit appropriate discipline; but it appears quite incongruous that disqualification should be the remedy, separating the client from his counsel without substitution of other protection for the client's interest. And the possibilities of endless disputes at the inception of lawsuits as to how the business was obtained are not to be overlooked.

Hence we find David H. Isacson and the firm of Malkan & Isacson properly disqualified under the terms of the order of March 22, 1955, as to the defendants Loew's Incorporated, Paramount Pictures Corporation, Twentieth Century-Fox Film

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

232 F.2d 199
**(Cite as: 232 F.2d 199)**

Corporation, Warner Bros. Pictures, Inc., Warner Bros. Pictures Distributing Corporation, RKO Radio Pictures, Inc., Columbia Pictures Corporation, Universal Pictures Company, Inc., and Republic Pictures Corporation; but this order of disqualification will not run as to the other defendants. The orders appealed from will therefore be modified to eliminate these other defendants as indicated; as thus modified they are affirmed. No costs will be taxed on this appeal.

Modified and affirmed as modified.

**\*205** HINCKS, Circuit Judge (concurring).

Although in complete agreement with the majority opinion, I feel constrained to say that I acquiesce in the failure of the court to refer the case for the institution of disciplinary proceedings against Mr. Isacson only because of my belief that on the facts of this case his adjudged disqualification, even though not imposed as disciplinary action, serves as an adequate penalty for all such unprofessional conduct as was disclosed in the disqualification proceedings below in the findings which we have affirmed.

232 F.2d 199

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

507 F.2d 554
**(Cite as: 507 F.2d 554)**

▷
United States Court of Appeals, Seventh Circuit.

Pearl SPENCE, Individually and as Administratrix
of the Estate of Jerome W.
Spence, Deceased, Plaintiff-Appellant,
v.
Henry D. STARAS et al., Defendants-Appellees.

No. 74-1038.

Argued Sept. 16, 1974.
Decided Dec. 16, 1974.

Plaintiff brought an action individually and as administratrix of the estate of her deceased son to recover damages for deprivation of her son's civil rights. The complaint charged that the deceased, who was a nonverbal state hospital inmate, had been beaten on at least 20 separate occasions by fellow patients, that he was thereafter again beaten by a fellow inmate and died as a result, that each of the defendant agents and employees of the hospital knew of the prior assaults and knew that deceased could not call for help or defend himself and was a frequent target of assault by fellow patients. The amended complaint was dismissed by the United States District Court for the Southern District of Illinois, Northern Division, Robert D. Morgan, Chief Judge, and plaintiff appealed. The Court of Appeals, Pell, Circuit Judge, held that although the plaintiff's individual action must fail under Illinois law, the action brought in the plaintiff's representative capacity was properly maintainable.

Reversed and remanded.

West Headnotes

**[1] Abatement and Revival** ☞57
2k57 Most Cited Cases

In federal civil rights action, where person who has been deprived of his rights has died, action survives for benefit of estate if applicable state law creates such survival action. U.S.C.A.Const. Amend. 14; 42 U.S.C.A. § 1983; S.H.A.Ill. ch. 3, § 339; ch. 70, §§ 1, 2; ch. 83, § 20.

**[2] Civil Rights** ☞1332(1)
78k1332(1) Most Cited Cases

(Formerly 78k202, 78k13.6)

In view of Illinois law, plaintiff in federal civil rights action could not sue as individual for deprivation of decedent's civil rights. U.S.C.A.Const. Amend. 14; 42 U.S.C.A. § 1983; S.H.A.Ill. ch. 3, § 339; ch. 70, §§ 1, 2; ch. 83, § 20.

**[3] Civil Rights** ☞1326(2)
78k1326(2) Most Cited Cases
(Formerly 78k198(2), 78k13.5(3))

Defendants as agents and employees of state hospital were acting under color of state law with respect to their responsibilities for care, custody and control of inmate. U.S.C.A.Const. Amend. 14; 42 U.S.C.A. § 1983; S.H.A.Ill. ch. 3, § 339; ch. 70, §§ 1, 2; ch. 83, § 20.

**[4] Constitutional Law** ☞255(5)
92k255(5) Most Cited Cases

State hospital inmate had right, under Fourteenth Amendment, to be secure in his life and person while confined under state authority. U.S.C.A.Const. Amend. 14; 42 U.S.C.A. § 1983; S.H.A.Ill. ch. 3, § 339, ch. 70, §§ 1, 2; ch. 83, § 20.

**[5] Health** ☞700
198Hk700 Most Cited Cases
(Formerly 257Ak53)

Defendant agents and employees of state hospital, being responsible for inmate's care and safekeeping, had duty to protect him from attacks by fellow inmates. U.S.C.A.Const. Amend. 14; 42 U.S.C.A. § 1983; S.H.A.Ill. ch. 3, § 339; ch. 70, §§ 1, 2; ch. 83, § 20.

**[6] Civil Rights** ☞1395(1)
78k1395(1) Most Cited Cases
(Formerly 78k235(1), 78k13.12(3))

Complaint alleging that plaintiff's decedent was inmate at state hospital, that defendants were jointly responsible for his exclusive care, custody and control, that he had been beaten on at least 20 separate occasions by fellow patients, and was then again beaten by fellow inmate and died as a result, that each defendant knew of the prior assaults and beatings committed on deceased and knew that he could not call for help or defend himself and was frequent target of assault by fellow patients, all of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

507 F.2d 554
**(Cite as: 507 F.2d 554)**

whom were under care, custody and control of defendants, and that defendants completely failed to provide protection was sufficient to state claim for relief under 1871 civil rights statute. U.S.C.A.Const. Amend. 14; 42 U.S.C.A. § 1983; S.H.A.Ill. ch. 3, § 339; ch. 70, §§ 1, 2; ch. 83, § 20.

**[7] Civil Rights ☞1376(3)**
78k1376(3) Most Cited Cases
(Formerly 78k214(3), 78k13.8(2))

State statute could not immunize state hospital superintendent from tort liability under federal statute. 42 U.S.C.A. § 1983; U.S.C.A.Const. Amend. 14; S.H.A.Ill. ch. 85, §§ 2-201, 6-107.

**[8] Civil Rights ☞1376(3)**
78k1376(3) Most Cited Cases
(Formerly 78k214(3), 78k13.8(2))

Defendant agents and employees of state hospital enjoyed only qualified immunity, dependent on good faith action, as against claim of deprivation of civil rights of hospital inmate. 42 U.S.C.A. § 1983; U.S.C.A.Const. Amend. 14; S.H.A.Ill. ch. 85, §§ 2-201, 6-107.

**[9] Death ☞10**
117k10 Most Cited Cases

Under Illinois law, where injury caused by defendant results in death, plaintiff may bring both an action under Wrongful Death Act and an action under survival statute. S.H.A.Ill. ch. 3, § 339; ch. 70, §§ 1, 2; ch. 83, § 20.

**[10] Civil Rights ☞1465(1)**
78k1465(1) Most Cited Cases
(Formerly 78k275(1), 78k13.17(7), 78k13.17)

Provided certain aggravating circumstances are shown, punitive damages are recoverable under federal law in action under 1871 civil rights statute. 42 U.S.C.A. § 1983.

**[11] Damages ☞89(1)**
115k89(1) Most Cited Cases

Provided certain aggravating circumstances are shown, punitive damages are recoverable under Illinois law in personal injury cases.

**[12] Civil Rights ☞1465(1)**

78k1465(1) Most Cited Cases
(Formerly 78k275(1), 78k13.17(7), 78k13.17)

Federal law permits recovery of punitive damages in actions under Civil Rights Acts even in absence of actual loss to plaintiff. 42 U.S.C.A. § 1983.

**[13] Damages ☞87(2)**
115k87(2) Most Cited Cases

Illinois rule is that punitive damages may not be awarded in absence of actual damages.
***556** Mort A. Segall, Champaign, Ill., for plaintiff-appellant.

Tim Swain, II, Sp. Asst. Atty. Gen., James L. Hafele, Peoria, Ill., for defendants-appellees.

Before FAIRCHILD, CUMMINGS and PELL, Circuit Judges.

PELL, Circuit Judge.

The plaintiff Pearl Spence brought this action, under 42 U.S.C. § 1983, individually and as administratrix of the estate of her deceased son, Jerome Spence, to recover damages for the deprivation of her son's civil rights. Sued as defendants were eight agents and employees of the Peoria State Hospital, an institution owned and operated by the State of Illinois. Jurisdiction was invoked under 28 U.S.C. § 1343(3). The district court dismissed the plaintiff's amended complaint and the plaintiff appeals.

The original complaint alleges that the deceased was an inmate at the Peoria State Hospital and that the defendants were jointly responsible for the exclusive care, custody, and control of the deceased. According to the complaint, the deceased, who was nonverbal, had been beaten on at least twenty separate occasions prior to May 21, 1972, by fellow patients. The complaint further charges that on May 21, 1972, the deceased was again beaten by a fellow inmate; that the deceased died on June 23, 1972, as a result of this beating; that each of the defendants knew of the twenty prior assaults and beatings committed on the deceased, and knew that the deceased was nonverbal and could not call for help or defend himself when

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

507 F.2d 554
**(Cite as: 507 F.2d 554)**

attacked, and knew that the deceased was a frequent target of assault by fellow patients, all of whom were under the care, custody, and control of the defendants; that the defendants, jointly, acting under color of state law, willfully, wantonly, recklessly, negligently, and intentionally [FN1] subjected the deceased to a deprivation of his right of personal security by their complete failure to provide any measure of protection for the deceased against the repeated attacks of his fellow inmates. The plaintiff, according to the complaint, has been duly qualified as administratrix of the estate of the decedent. The plaintiff seeks both actual and punitive damages.

> FN1. We find no particular support for the plaintiff's case in the stringing use of conduct-characterization adjectives. The defendants contend that negligence is not actionable under § 1983 and clearly 'more than an isolated incident of negligent failure to protect must be alleged.' Williams v. Field, 416 F.2d 483, 485 (9th Cir. 1969), cert. denied, 397 U.S. 1016, 90 S.Ct. 1252, 25 L.Ed.2d 431 (1970). In any event, we are here not concerned with the characterization adjectives but with the course of continuing knowledge and continuing lack of protection provided to one committed to the custody of the defendants. All of the parties cite cases developed in prisoners' actions. While we find these cases are certainly analogous, and the constitutional principles applicable are substantially identical, we also observe that a prisoner has presumably voluntarily transgressed the rules of conduct imposed by society in the code of criminal laws while here the decedent was guilty of nothing more than succumbing to an illness.

The district court dismissed the complaint with leave for the plaintiff to amend it to allege (1) a specific constitutional violation and (2) pecuniary loss. The plaintiff amended the complaint by adding two paragraphs which alleged that the deceased had been deprived of his rights under the Fourteenth Amendment to liberty and life and that the deceased left surviving him the plaintiff as lineal next of kin, and the plaintiff sustained pecuniary

loss by reason of the death of the decedent. The district court dismissed the amended complaint.

**\*557** I

[1][2] In a federal civil rights action where the person who has been deprived of his rights has died, the action survives for the benefit of the estate if the applicable state law creates such a survival action. Brazier v. Cherry, 293 F.2d 401 (5th Cir. 1961), cert. denied, 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136; Evain v. Conlisk, 364 F.Supp. 1188, 1191 (N.D.Ill. 1973); Holmes v. Silver Cross Hosp., 340 F.Supp. 125, 129 (N.D.Ill.1972). See also Baker v. F & F Investment, 420 F.2d 1191, 1196 n. 7 (7th Cir. 1970), cert. denied, 400 U.S. 821, 91 S.Ct. 40, 27 L.Ed.2d 49. Illinois does provide for the survival of an action to recover damages for injury to the decedent while he was alive (Ill.Rev.Stat. Ch. 3, § 339), and for the survival of an action to recover pecuniary losses incurred by the decedent's next of kin due to the decedent's death (Ill.Rev.Stat. Ch. 70, §§ 1 and 2). Under Illinois law, these actions must be brought in a representative, rather than an individual, capacity. Ill.Rev.Stat. Ch. 70, § 2; Ill.Rev.Stat. Ch. 83, § 20.

In the present case, the plaintiff sued both individually and as administratrix of her son's estate. Although the individual action must fail under Illinois law, the action brought in the plaintiff's representative capacity is properly maintainable.

II

[3][4][5] Viewing the allegations of the amended complaint and all reasonable inferences which can be drawn from them as true, we are convinced that the plaintiff has stated a cause of action under § 1983. See Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The defendants, as agents and employees of a state hospital, were clearly acting under color of state law. See Wheeler v. Glass, 473 F.2d 983, 985 (7th Cir. 1973). It is equally clear that the deceased had a right, under the Fourteenth Amendment, to be secure in his life and person while confined under state authority. [FN2] See Brazier v. Cherry, supra. The defendants, being responsible for the decedent's care and safekeeping, had a duty to protect him from attacks by fellow inmates. Welsch v. Likins, 373 F.Supp. 487, 502-503 (D.Minn.1974); New

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

507 F.2d 554
(Cite as: 507 F.2d 554)

York State Ass'n for Retarded Children v. Rockefeller,357 F.Supp. 752, 764 (E.D.N.Y.1973).

> FN2. We found somewhat shocking the observation in the brief of the Attorney General on behalf of the defendants that 'no case has been found (supporting) a specific right to exist or a right to the enjoyment of life.'

[6][7][8] The present complaint, moreover, contains sufficient allegations regarding the defendant's knowledge of the beatings of the decedent to make the claim actionable under § 1983 . Although the complaint does not allege direct participation by the defendants in the beatings, the complaint does allege more than an 'isolated incident' or mere negligent supervision. The complaint here expressly alleges that the defendants knew that the decedent was the target of assaults by fellow inmates, knew that he had been beaten on at least twenty prior occasions, and knew that he was nonverbal and unable to call for help or defend himself when attacked, and yet the defendants failed to protect the deceased. Assuming, as we must on a motion to dismiss, that the plaintiff can prove these allegations, the defendants' inaction was of sufficient magnitude to constitute a deprivation of rights under § 1983. The defendants' reliance on Adams v. Pate, 445 F.2d 105 (7th Cir. 1971), and Williams v. Field, 416 F.2d 483, 485 (9th Cir. 1969) , cert. denied, 397 U.S. 1016, 90 S.Ct. 1252, 25 L.Ed.2d 431 (1970), is, therefore, inapposite. See Curtis v. Everette, 489 F.2d 516 (3d Cir. 1973), cert. denied, Smith v. Curtis, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774; Parker v. McKeithen, 488 F.2d 553 (5th Cir. 1974). [FN3]

> FN3. Dr. Staras, Superintendent of the Hospital, also contends that he is immune from suit under the Illinois Tort Immunity Act, Ill.Rev.Stat. Ch. 85, §§ 2-201, 6-107. However, as this court pointed out in McLaughlin v. Tilendis, 398 F.2d 287, 290 (7th Cir. 1968), 'under the Supremacy Clause, that statute cannot protect defendants against a cause of action grounded, as here, on a federal statute.' Since the defendants here are neither legislators nor judges, they retain 'only a

qualified immunity, dependent on good faith action.' Id. While some or all of the defendants may be able to assert the defense of reasonableness and good faith, the plaintiffs are nonetheless entitled to an opportunity to prove the allegations in the complaint. McLaughlin; Wheeler v. Glass, supra 473 F.2d at 985.

*558 The defendants contend, however, that the complaint should nevertheless be dismissed for failure to allege, with specificity, pecuniary loss, the only type of damages recoverable under the Illinois Wrongful Death Act. Ill.Rev.Stat. Ch. 70, § 1. Graul v. Adrian, 32 Ill.2d 345, 205 N.E.2d 444 (1965). The Supreme Court has indicated that, in civil rights actions, 'both federal and state rules on damages may be utilized, whichever better serves the policies expressed in the federal statutes.' Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 240, 90 S.Ct. 400, 406, 24 L.Ed.2d 386 (1969).

[9] The defendants' argument, which was apparently accepted by the district judge, is based on Illinois case law which held that where, as here, the plaintiff's decedent died from the injuries allegedly caused by the defendant, the plaintiff could only bring an action for pecuniary loss under the Wrongful Death Act and not an action, under the Survival Statute, for personal injury and pain and suffering to the decedent before he died. See Holton v. Daly, 106 Ill. 131 (1882). The Illinois Supreme Court, however, has, since the time the district court dismissed the present complaint, reversed this line of cases and has expressly held that where the injury caused by the defendant results in death, the plaintiff may bring both an action under the Wrongful Death Act and one under the Survival Statute. Murphy v. Martin Oil Co., 56 Ill.2d 423, 308 N.E.2d 583 (1974). In the present case, the complaint contains a general prayer for actual damages as well as an allegation of pecuniary loss to the plaintiff as decedent's next kin. Although the plaintiff may have difficulty, as the district court noted, in proving pecuniary loss due to the death of her nonverbal, mentally-ill son, the plaintiff may well be able to prove actual damages resulting from the decedent's pain and suffering prior to his death.

[10][11][12][13] Moreover, the complaint here requested punitive as well as actual damages. Provided certain aggravating circumstances are

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

shown, punitive damages are recoverable under federal law in a § 1983 action, Morales v. Haines, 486 F.2d 880, 882 (7th Cir. 1973); Smith v. Losee, 485 F.2d 334, 345 (10th Cir. 1973), cert. denied, 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212; McDaniel v. Carroll, 457 F.2d 968, 969 (6th Cir. 1972); Mansell v. Saunders, 372 F.2d 573 (5th Cir. 1967), and under Illinois law in personal injury cases, Madison v. Wigal, 18 Ill.App.2d 564, 153 N.E.2d 90 (1958). Federal law, furthermore, permits recovery of such damages in actions under the civil rights acts even in the absence of actual loss to the plaintiff. Rogers v. Loether, 467 F.2d 1110, 1112 n. 4 (7th Cir. 1972); Basista v. Weir, 340 F.2d 74, 88 (3d Cir. 1965). [FN4]

> FN4. The Illinois rule is that punitive damages may not be awarded in the absence of actual damages. Tonchen v. All-Steel Equip., Inc., 13 Ill.App.3d 454, 300 N.E.2d 616, 624 (1973).

We do not suggest that the plaintiff ultimately will be able to prove facts entitling her to actual or punitive damages or even that summary judgment procedures may not develop a lack of liability under § 1983 on the part of some or all of the defendants. We merely hold that the complaint contains sufficient allegations with regard to damages, regardless of whether the state or the federal rules on damages are applied, to withstand a motion to dismiss which here was broadly sweeping as to all defendants.

Accordingly we reverse and remand for further proceedings not inconsistent with this opinion.

Reversed and remanded.

507 F.2d 554

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

against the insurance company which employed the attorney to represent the former client.

RPC 77. A lawyer may disclose confidential information to his or her liability insurer to defend against a claim but not for the sole purpose of assuring coverage.

RPC 113. A lawyer may disclose information concerning advice given to a client at a closing in regard to the significance of the client's lien affidavit.

RPC 117. An attorney may not reveal confidential information concerning a client's contagious disease without the client's consent.

RPC 120. An attorney may, but need not necessarily, disclose confidential information concerning child abuse pursuant to a statutory requirement.

RPC 133. A law firm may make its waste paper available for recycling.

RPC 157. A lawyer may seek the appointment of a guardian for a client the lawyer believes to be incompetent but in so doing the lawyer may disclose only her belief that there exists a good faith basis for the relief requested and may not disclose confidential information which led her to conclude the client is incompetent.

RPC 175. A lawyer may ethically exercise his or her discretion to decide whether to reveal confidential information concerning child abuse or neglect pursuant to a statutory requirement.

RPC 179. A lawyer must comply with the client's request that the information regarding a settlement be kept confidential if the client enters into a settlement agreement conditioned upon maintaining the confidentiality of the terms of the settlement.

RPC 195. The attorney who represented an estate and the personal representative in her official capacity may divulge confidential information relating to the representation of the estate and the personal representative to the substitute personal representative of the estate.

RPC 206. A lawyer may disclose the confidential information of a deceased client to the personal representative of the client's estate but not to the heirs of the estate.

RPC 209. Opinion provides guidelines for the disposal of closed client files.

RPC 215. When using a cellular or cordless telephone or any other unsecure method of communication, a lawyer must take steps to minimize the risk that confidential information may be disclosed.

RPC 230. A lawyer representing a client on a good faith claim for social security disability benefits may withhold evidence of an adverse medical report in a hearing before an administrative law judge if not required by law or court order to produce such evidence. (*But see* Rule 3.3.)

RPC 244. Although a lawyer asks a prospective client to sign a form stating that no client-lawyer relationship will be created by reason of a free consultation with the lawyer, the lawyer may not subsequently disclaim the creation of a client-lawyer relationship and represent the opposing party.

RPC 246. Under certain circumstances, a lawyer may not represent a party whose interests are opposed to the interests of a prospective client if confidential information of the prospective client must be used in the representation.

RPC 252. A lawyer in receipt of materials that appear on their face to be subject to the attorney-client privilege or otherwise confidential, which were inadvertently sent to the lawyer by the opposing party or opposing counsel, should refrain from examining the materials and return them to the sender.

98 FEO 5. Opinion rules that a defense lawyer may remain silent while the prosecutor presents an inaccurate driving record to the court provided the lawyer and client did not criminally or fraudulently misrepresent the driving record to the prosecutor or the court, and further provided, that on application for a limited driving privilege, there is no misrepresentation to the court about the client's prior driving record.

98 FEO 10. Opinion rules that an insurance defense lawyer may not disclose confidential information about an insured's representation in bills submitted to an independent audit company at the insurance carrier's request unless the insured consents.

98 FEO 16. Opinion rules that a lawyer may represent a person who is resisting an incompetency petition although the person may suffer from a mental disability, provided the lawyer determines that resisting the incompetency petition is not frivolous.

98 FEO 18. Opinion rules that a lawyer representing a minor owes the duty of confidentiality to the minor and may only disclose confidential information to

the minor's parent, without the minor's consent, if the parent is the legal guardian of the minor and the disclosure of the information is necessary to make a binding legal decision about the subject matter of the representation.

98 FEO 20. Opinion rules that, subject to a statute prohibiting the withholding of the information, a lawyer's duty to disclose confidential client information to a bankruptcy court ends when the case is closed although the debtor's duty to report new property continues for 180 days after the date of filing the petition.

99 FEO 11. Opinion rules that an insurance defense lawyer may not submit billing information to an independent audit company at the insurance carrier's request unless the insured's consent to the disclosure, obtained by the insurance carrier, was informed.

99 FEO 15. Opinion rules that a lawyer with knowledge that a former client is defrauding a bankruptcy court may reveal the confidences of the former client if required by law or if necessary to rectify the fraud.

2000 FEO 1. Opinion rules that a lawyer who was formerly in-house legal counsel for a corporation must obtain the permission of a court prior to disclosing confidential information of the corporation to support a personal claim for wrongful termination.

2002 FEO 7. Opinion clarifies RPC 206 by ruling that a lawyer may reveal the relevant confidential information of a deceased client in a will contest proceeding if the attorney/client privilege does not apply to the lawyer's testimony.

## CASE NOTES

Statement to Insurance Adjuster. - The attorney-client privilege does not cover a statement made to an insurance adjuster, not in the presence or at the request of counsel, and even before an attorney-client relationship exists. *Phillips v. Dallas Carrier Corp.*, 133 F.R.D. 475 (M.D.N.C. 1990).

Law firm was disqualified from representing plaintiff computer company in copyright case against another company which hired three of plaintiff's engineers where the law firm had previously represented one of the engineers. *Robert Woodhead, Inc. v. Datawatch Corp.*, 934 F. Supp. 181 (E.D.N.C. 1995).

Applied in *SuperGuide Corp. v. DirecTV Enters., Inc.*, 141 F. Supp. 2d 616 (W.D.N.C. 2001).

Quoted in *Travco Hotels, Inc. v. Piedmont Natural Gas Co.*, 332 N.C. 288, 420 S.E.2d 426 (1992).

Stated in *Furbush v. Otsego Mach. Shop, Inc.*, 914 F. Supp. 1275 (E.D.N.C. 1996).

## RULE 1.7: CONFLICT OF INTEREST: CURRENT CLIENTS

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) the representation of one or more clients may be materially limited by the lawyer's responsibilities to another client, a former client, or a third person, or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

## Comment

### General Principles

[1] Loyalty and independent judgment are essential elements in the lawyer's relationship to a client. Concurrent conflicts of interest can arise from the lawyer's responsibilities to another client, a former client or a third person or from the lawyer's own interests. For specific Rules regarding certain concurrent conflicts of interest, see Rule 1.8. For former client conflicts of interest, see Rule

Case 5:03-cv-00469-BR   Document 20   Filed 03/15/04   Page 58 of 60

1.9. For conflicts of interest involving prospective clients, see Rule 1.18. For definitions of "informed consent" and "confirmed in writing," see Rule 1.0(f) and (c).

[2] Resolution of a conflict of interest problem under this Rule requires the lawyer to: 1) clearly identify the client or clients; 2) determine whether a conflict of interest exists; 3) decide whether the representation may be undertaken despite the existence of a conflict, i.e., whether the conflict is consentable; and 4) if so, consult with the clients affected under paragraph (a) and obtain their informed consent, confirmed in writing. The clients affected under paragraph (a) include both of the clients referred to in paragraph (a)(1) and the one or more clients whose representation might be materially limited under paragraph (a)(2).

[3] A conflict of interest may exist before representation is undertaken, in which event the representation must be declined, unless the lawyer obtains the informed consent of each client under the conditions of paragraph (b). To determine whether a conflict of interest exists, a lawyer should adopt reasonable procedures, appropriate for the size and type of firm and practice, to determine in both litigation and non-litigation matters the persons and issues involved. See also Comment to Rule 5.1. Ignorance caused by a failure to institute such procedures will not excuse a lawyer's violation of this Rule. As to whether a client-lawyer relationship exists or, having once been established, is continuing, see Comment to Rule 1.3 and Scope.

[4] If a conflict arises after representation has been undertaken, the lawyer ordinarily must withdraw from the representation, unless the lawyer has obtained the informed consent of the client under the conditions of paragraph (b). See Rule 1.16. Where more than one client is involved, whether the lawyer may continue to represent any of the clients is determined both by the lawyer's ability to comply with duties owed to the former client and by the lawyer's ability to represent adequately the remaining client or clients, given the lawyer's duties to the former client. See Rule 1.9. See also Comments [5] and [29] to this Rule.

[5] Unforeseeable developments, such as changes in corporate and other organizational affiliations or the addition or realignment of parties in litigation, might create conflicts in the midst of a representation, as when a company sued by the lawyer on behalf of one client is bought by another client represented by the lawyer in an unrelated matter. Depending on the circumstances, the lawyer may have the option to withdraw from one of the representations in order to avoid the conflict. The withdrawing lawyer must seek court approval where necessary and take steps to minimize harm to the clients. See Rule 1.16. The lawyer must continue to protect the confidences of the client from whose representation the lawyer has withdrawn. See Rule 1.9(c).

### Identifying Conflicts of Interest: Directly Adverse

[6] Loyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed consent. Thus, absent consent, a lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated. The client as to whom the representation is directly adverse is likely to feel betrayed, and the resulting damage to the client-lawyer relationship is likely to impair the lawyer's ability to represent the client effectively. In addition, the client on whose behalf the adverse representation is undertaken reasonably may fear that the lawyer will pursue that client's case less effectively out of deference to the other client, i.e., that the representation may be materially limited by the lawyer's interest in retaining the current client. Similarly, a directly adverse conflict may arise when a lawyer is required to cross-examine a client who appears as a witness in a lawsuit involving another client, as when the testimony will be damaging to the client who is represented in the lawsuit. On the other hand, simultaneous representation in unrelated matters of clients whose interests are only economically adverse, such as representation of competing economic enterprises in unrelated litigation, does not ordinarily constitute a conflict of interest and thus may not require consent of the respective clients.

[7] Directly adverse conflicts can also arise in transactional matters. For example, if a lawyer is asked to represent the seller of a business in negotiations with a buyer represented by the lawyer, not in the same transaction but in another, unrelated matter, the lawyer could not undertake the representation without the informed consent of each client.

### Identifying Conflicts of Interest: Material Limitation

[8] Even where there is no direct adverseness, a conflict of interest exists if a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client may be materially limited as a result of the lawyer's other responsibilities or interests. For example, a lawyer asked to represent a seller of commercial real estate, a real estate developer and a commercial lender is likely to be materially limited in the lawyer's ability to recommend or advocate all possible positions that each might take because of the lawyer's duty of loyalty to the others. The conflict in effect forecloses alternatives that would otherwise be available to the client. The mere possibility of subsequent harm does not itself preclude the representation or require disclosure and consent. The critical questions are the likelihood that a difference in interests will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client.

### Lawyer's Responsibilities to Former Clients and Other Third Persons

[9] In addition to conflicts with other current clients, a lawyer's duties of loyalty and independence may be materially limited by responsibilities to former clients under Rule 1.9 or by the lawyer's responsibilities to other persons, such as fiduciary duties arising from a lawyer's service as a trustee, executor or corporate director.

### Personal Interest Conflicts

[10] The lawyer's own interests should not be permitted to have an adverse effect on representation of a client. For example, if the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice. Similarly, when a lawyer has discussions concerning possible employment with an opponent of the lawyer's client, or with a law firm representing the opponent, such discussions could materially limit the lawyer's representation of the client. In addition, a lawyer may not allow related business interests to affect representation, for example, by referring clients to an enterprise in which the lawyer has an undisclosed financial interest. See Rule 1.8 for specific Rules pertaining to a number of personal interest conflicts, including business transactions with clients. See also Rule 1.10 (personal interest conflicts under Rule 1.7 ordinarily are not imputed to other lawyers in a law firm).

[11] When lawyers representing different clients in the same matter or in substantially related matters are closely related by blood or marriage, there may be a significant risk that client confidences will be revealed and that the lawyer's family relationship will interfere with both loyalty and independent professional judgment. As a result, each client is entitled to know of the existence and implications of the relationship between the lawyers before the lawyer agrees to undertake the representation. Thus, a lawyer related to another lawyer, e.g., as parent, child, sibling or spouse, ordinarily may not represent a client in a matter where that lawyer is representing another party, unless each client gives informed consent. The disqualification arising from a close family relationship is personal and ordinarily is not imputed to members of firms with whom the lawyers are associated. See Rule 1.10.

[12] A lawyer is prohibited from engaging in sexual relationships with a client unless the sexual relationship predates the formation of the client-lawyer relationship. See Rule 1.19.

### Interest of Person Paying for a Lawyer's Service

[13] A lawyer may be paid from a source other than the client, including a co-client, if the client is informed of that fact and consents and the arrangement does not compromise the lawyer's duty of loyalty or independent judgment to the client. See Rule 1.8(f). If acceptance of the payment from any other source presents a significant risk that the lawyer's representation of the client will be materially limited by the lawyer's own interest in accommodating the person paying the lawyer's fee or by the lawyer's responsibilities to a payer who is also a co-client, then the lawyer must comply with the requirements of paragraph (b) before accepting the representation, including determining whether the conflict is consentable and, if so, that the client has adequate information about the material risks of the representation.

### Prohibited Representations

[14] Ordinarily, clients may consent to representation notwithstanding a conflict. However, as indicated in paragraph (b), some conflicts are nonconsentable, meaning that the lawyer involved cannot properly ask for such agree-

Case 5:03-cv-00469-BR   Document 28   Filed 03/15/04   Page 59 of 60

ment or provide representation on the basis of the client's consent. When the lawyer is representing more than one client, the question of consentability must be resolved as to each client.

[15] Consentability is typically determined by considering whether the interests of the clients will be adequately protected if the clients are permitted to give their informed consent to representation burdened by a conflict of interest. Thus, under paragraph (b)(1), representation is prohibited if in the circumstances the lawyer cannot reasonably conclude that the lawyer will be able to provide competent and diligent representation. See Rule 1.1 (competence) and Rule 1.3 (diligence).

[16] Paragraph (b)(2) describes conflicts that are nonconsentable because the representation is prohibited by applicable law. For example, in some states substantive law provides that the same lawyer may not represent more than one defendant in a capital case, even with the consent of the clients, and under federal criminal statutes certain representations by a former government lawyer are prohibited, despite the informed consent of the former client. In addition, decisional law in some states limits the ability of a governmental client, such as a municipality, to consent to a conflict of interest.

[17] Paragraph (b)(3) describes conflicts that are nonconsentable because of the institutional interest in vigorous development of each client's position when the clients are aligned directly against each other in the same litigation or other proceeding before a tribunal. Whether clients are aligned directly against each other within the meaning of this paragraph requires examination of the context of the proceeding. Although this paragraph does not preclude a lawyer's multiple representation of adverse parties to a mediation (because mediation is not a proceeding before a "tribunal" under Rule 1.0(n)), such representation may be precluded by paragraph (b)(1).

*Informed Consent*

[18] Informed consent requires that each affected client be aware of the relevant circumstances and of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interests of that client. See Rule 1.0(f) (informed consent). The information required depends on the nature of the conflict and the nature of the risks involved. When representation of multiple clients in a single matter is undertaken, the information must include the implications of the common representation, including possible effects on loyalty, confidentiality and the attorney-client privilege and the advantages and risks involved. See Comments [30] and [31] (effect of common representation on confidentiality).

[19] Under some circumstances it may be impossible to make the disclosure necessary to obtain consent. For example, when the lawyer represents different clients in related matters and one of the clients refuses to consent to the disclosure necessary to permit the other client to make an informed decision, the lawyer cannot properly ask the latter to consent. In some cases the alternative to common representation can be that each party may have to obtain separate representation with the possibility of incurring additional costs. These costs, along with the benefits of securing separate representation, are factors that may be considered by the affected client in determining whether common representation is in the client's interests.

*Consent Confirmed in Writing*

[20] Paragraph (b) requires the lawyer to obtain the informed consent of the client, confirmed in writing. Such a writing may consist of a document executed by the client or one that the lawyer promptly records and transmits to the client following an oral consent. See Rule 1.0(c). See also Rule 1.0(o) (writing includes electronic transmission). If it is not feasible to obtain or transmit the writing at the time the client gives informed consent, then the lawyer must obtain or transmit it within a reasonable time thereafter. See Rule 1.0(c). The requirement of a writing does not supplant the need in most cases for the lawyer to talk with the client, to explain the risks and advantages, if any, of representation burdened with a conflict of interest, as well as reasonably available alternatives, and to afford the client a reasonable opportunity to consider the risks and alternatives and to raise questions and concerns. Rather, the writing is required in order to impress upon the client the seriousness of the decision the client is being asked to make and to avoid disputes or ambiguities that might later occur in the absence of a writing.

*Revoking Consent*

[21] A client who has given consent to a conflict may revoke the consent

and, like any other client, may terminate the lawyer's representation at any time. Whether revoking consent to the client's own representation precludes the lawyer from continuing to represent other clients depends on the circumstances, including the nature of the conflict, whether the client revoked consent because of a material change in circumstances, the reasonable expectations of the other client and whether material detriment to the other clients or the lawyer would result.

*Consent to Future Conflict*

[22] Whether a lawyer may properly request a client to waive conflicts that might arise in the future is subject to the test of paragraph (b). The effectiveness of such waivers is generally determined by the extent to which the client reasonably understands the material risks that the waiver entails. The more comprehensive the explanation of the types of future representations that might arise and the actual and reasonably foreseeable adverse consequences of those representations, the greater the likelihood that the client will have the requisite understanding. Thus, if the client agrees to consent to a particular type of conflict with which the client is already familiar, then the consent ordinarily will be effective with regard to that type of conflict. If the consent is general and open-ended, then the consent ordinarily will be ineffective, because it is not reasonably likely that the client will have understood the material risks involved. On the other hand, if the client is an experienced user of the legal services involved and is reasonably informed regarding the risk that a conflict may arise, such consent is more likely to be effective, particularly if, e.g., the client is independently represented by other counsel in giving consent and the consent is limited to future conflicts unrelated to the subject of the representation. In any case, advance consent cannot be effective if the circumstances that materialize in the future are such as would make the conflict nonconsentable under paragraph (b).

*Conflicts in Litigation*

[23] Paragraph (b)(3) prohibits representation of opposing parties in the same litigation, regardless of the clients' consent. On the other hand, simultaneous representation of parties whose interests in litigation may conflict, such as coplaintiffs or codefendants, is governed by paragraph (a)(2). A conflict may exist by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question. Such conflicts can arise in criminal cases as well as civil. The potential for conflict of interest in representing multiple defendants in a criminal case is so grave that ordinarily a lawyer should decline to represent more than one codefendant. On the other hand, common representation of persons having similar interests in civil litigation is proper if the requirements of paragraph (b) are met.

[24] Ordinarily a lawyer may take inconsistent legal positions in different tribunals at different times on behalf of different clients. The mere fact that advocating a legal position on behalf of one client might create precedent adverse to the interests of a client represented by the lawyer in an unrelated matter does not create a conflict of interest. A conflict of interest exists, however, if there is a significant risk that a lawyer's action on behalf of one client will materially limit the lawyer's effectiveness in representing another client in a different case; for example, when a decision favoring one client will create a precedent likely to seriously weaken the position taken on behalf of the other client. Factors relevant in determining whether the clients need to be advised of the risk include: where the cases are pending, whether the issue is substantive or procedural, the temporal relationship between the matters, the significance of the issue to the immediate and long-term interests of the clients involved and the clients' reasonable expectations in retaining the lawyer. If there is significant risk of material limitation, then absent informed consent of the affected clients, the lawyer must refuse one of the representations or withdraw from one or both matters.

[25] When a lawyer represents or seeks to represent a class of plaintiffs or defendants in a class-action lawsuit, unnamed members of the class are ordinarily not considered to be clients of the lawyer for purposes of applying paragraph (a)(1) of this Rule. Thus, the lawyer does not typically need to get the consent of such a person before representing a client suing the person in an unrelated matter. Similarly, a lawyer seeking to represent an opponent in a class action does not typically need the consent of an unnamed member of the class whom the lawyer represents in an unrelated matter.

Case 5:03-cv-00469-BR   Document 28   Filed 03/15/04   Page 60 of 60